[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
10/28/99
THOMAS K. KAHN
CLERK

_____

No. 97-5078

_____

D. C. Docket No. 95-6517-CV-KLR


CITIZENS CONCERNED ABOUT OUR CHILDREN,
JANE DOE, as legal guardian of Mary Doe, J. SHAQ,
as legal guardian of L. Shaq,

                                        Plaintiffs-Appellants,

                    versus

SCHOOL BOARD OF BROWARD COUNTY, FLORIDA,
FRANK PETTRUZZIELO,

                                        Defendants-Appellees.

_____

No. 98-4199
_____

D. C. Docket No. 95-6517-CV-KLR


JANE DOE, as Legal Guardian of Mary Doe,
J. SHAQ, as legal guardian of L. Shaq,

                                        Plaintiffs-Appellants,

                        versus

SCHOOL BOARD OF BROWARD COUNTY, FLORIDA,
FRANK PETTRUZZIELO,

                                        Defendants-Appellees.


_____

Appeals from the United States District Court
for the Southern District of Florida
_____
**(October 28, 1999)**


Before COX and BARKETT, Circuit Judges, and FAY, Senior Circuit Judge.

PER CURIAM:

In two separate appeals, L. Shaq and Mary Doe — both minors represented by their guardians — and an unincorporated association calling itself Citizens Concerned About Our Children (CCC) challenge the district court's judgment against them on their claims against the Broward County, Florida School Board for discrimination in violation of the Equal Protection Clause. Addressing the two appeals together, we conclude that we lack jurisdiction over CCC's interlocutory appeal, that Shaq and Doe's interlocutory appeal (which is joined with CCC's) is meritless, and that the district court's final summary judgment, the subject of the second appeal, was only partially correct.

## I. Background

In a series of actions beginning thirty years ago, black plaintiffs have accused the Broward County Schools of impermissibly race-conscious policies. One of those actions, begun in 1983, ended in 1987 with a consent decree. Among other things, that decree required review of all student-assignment policies by a biracial committee and restriction of magnet programs to majority-black schools. School Board policy adopted under the decree requires consideration of the "racial/ethnic backgrounds of the student population at each school in order to maintain a unitary school system." (R.6-272 at 16.) The practical application of this policy was busing students (as it

3

turned out far more black than white) to schools outside their neighborhoods. Plaintiff Doe rode one of these buses for five years, through fifth grade.

The School Board also adopted a magnet school policy under the consent decree. The magnet programs, as the name implies, were special curricula designed to attract white students to mostly black schools. In the name of integration of majority-black schools, some magnet programs preferred white pupils over black pupils up to certain quotas. Shaq, a black pupil, was denied entry to a magnet program in a majority-black school for a month at the beginning of a school year, allegedly because of such a quota.

Shaq and Doe sued the School Board, claiming that Doe's busing and Shaq's exclusion from the magnet program violated their rights under the Fourteenth Amendment. In addition to these particularized claims by these individual plaintiffs, the complaint included claims of discrimination throughout the Broward County system in funding, facilities, and resources. In asserting these claims, the two individual plaintiffs were joined by CCC, which the complaint describes as "an unincorporated organization comprised of leaders in the African-American community who have joined together for the common purpose of ending racially inspired policies of the BROWARD COUNTY SCHOOL BOARD." (R.1-23 at 2.)

4

The district court dismissed CCC's claims for want of standing, and it dismissed the claims of Shaq and Doe for equitable relief on the ground that, their claims mooted, they too lacked standing. CCC, Shaq, and Doe filed an interlocutory appeal. The district court later granted the School Board summary judgment on Shaq and Doe's remaining claims for damages on the ground that the School Board had a compelling interest to justify its race-conscious policies — obeying the consent decree. The court also concluded that Shaq and Doe lacked standing to assert claims of system-wide discrimination, and that Shaq and Doe had proffered insufficient evidence that their schools had poor facilities due to race. The court thus entered final judgment, and Shaq and Doe appealed.

The primary issue raised in the interlocutory appeal is whether CCC has standing to pursue any of the stated claims. In the appeal from final judgment, the principal argument is that the district court erred in concluding that the evidence of discriminatory intent was insufficient.[1] Because the district court ruled on motions for summary judgment, our review is de novo, *see NAACP v. Hunt*, 891 F.2d 1555, 1559 (11th Cir. 1990), and we apply the same familiar summary-judgment standards.

## II. Discussion

---

[1] Shaq and Doe also argue that Judge Ryskamp should have recused himself for unfair bias. This argument is meritless, and we reject it without further discussion. *See* 11th Cir. R. 36-1.

A. Jurisdiction over CCC's Interlocutory Appeal[2]

This court raised the question whether appellate jurisdiction exists over CCC's interlocutory appeal. Having reviewed the parties' briefs, we conclude that there is no jurisdiction.[3]

As Rule 54 implies, a judgment that eliminates fewer than all the claims or parties is not a final, appealable judgment; thus, an order dismissing one plaintiff, but not others, is not immediately appealable by the dismissed plaintiff. *See Robinson v. Parke-Davis & Co.*, 685 F.2d 912, 913 (4th Cir. 1982).[4] Absent some exception to the

---

[2]  Shaq and Doe joined in this interlocutory appeal to argue that the court improperly granted summary judgment against them on their claims for injunctive relief because, having been admitted to the school and programs of their choice, they have lost standing. We have jurisdiction over this appeal, *see* 28 U.S.C. § 1292(a)(1), and see no merit to it. Showing standing is the plaintiffs' burden, and we agree after reviewing the record that there is no evidence here that Shaq and Doe face any "real and immediate" danger of being assigned, because of their race, to a school they do not wish to attend. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S. Ct. 1660, 1665 (1983). The district court thus did not err in entering summary judgment on this aspect of their claims. *Cf. id.* at 106-09, 103 S. Ct. at 1667-69.

[3]  Our jurisdiction over Shaq and Doe's interlocutory appeal does not confer jurisdiction over CCC's appeal: Pendant party appellate jurisdiction does not exist. *See Swint v. Chambers County Comm'n*, 514 U.S. 35, 51, 115 S. Ct. 1203, 1212 (1995).

[4]  Judge Barkett cites *Transamerica Finance Corp. v. Banton, Inc.*, 970 F.2d 810, 814-15 (11th Cir. 1992), for the proposition that parties dismissed from an action may always appeal even if the action continues with the other parties in the district court. We decline to read *Transamerica*, which concerned defendants against whom default judgments had been entered and Rule 11 sanctions imposed, to have so broad an effect. First, the opinion itself focuses heavily on the fact that sanction accompanied the default judgment, and that sanctions — being independent from the merits — often fall into the *Cohen* exception to the final judgment rule. *See* id. at 814-15. Second, the court emphasized that in "the unique circumstances of this case," the two defendants (there were eight defendants remaining) could not obtain appellate review of the sanctions. *See* id. at 815. Finally, interpreting *Transamerica* to authorize all interlocutory appeals by a party who has been dismissed from an action would be difficult to harmonize with Rule 54(b). *See* Fed. R. Civ.

final judgment rule, therefore, CCC could not appeal interlocutorily.  CCC invokes two exceptions.  First, it argues that the order had the effect of denying it the injunctive relief it requested in its complaint, thus authorizing interlocutory appeal under 28 U.S.C. § 1292(a)(1).  *Cf. General Elec. Co. v. Marvel Rare Metals Co.*, 287 U.S. 430, 431-33, 53 S. Ct. 202, 203-04 (1932).  Second, it contends that standing is a *Cohen* issue, and a district court order ruling on it is therefore immediately appealable.  *See Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S. Ct. 1221, 1225-26 (1949).  We reject both of these contentions.

On the first point, we acknowledge that an order that does not rule on a request for injunctive relief, but that has the effect of denying it, may be immediately appealable.  *See Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 379, 107 S. Ct. 1177, 1183 (1987).  For such an interlocutory order to be appealable before final judgment, the prospective appellant must show that the denial of injunctive relief has a "serious, perhaps irreparable, consequence, and that the order can be effectually challenged only by immediate appeal."  *Id.* (internal quotation marks omitted) (quoting *Carson v. American Brands, Inc.* 450 U.S. 79, 84, 101 S. Ct. 993, 996 (1981)

P. 54(b) ("In the absence of such a determination and direction [that is, 54(b) partial final judgment], any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties . . . .").

7

(in turn quoting *Baltimore Contractors, Inc. v. Bodinger*, 348 U.S. 176, 181, 75 S. Ct. 249, 252 (1955)).

CCC cannot carry that burden. While the complaint does request injunctive relief, and in its catchall conclusion, "additional preliminary and permanent relief as may appear to the Court to be just and proper," (R.1-23 at 9 ¶ 33(f)), in the nearly two years between the filing of the complaint and the district court's dismissal of CCC's claims for want of standing, CCC did not move for preliminary injunctive relief. Admittedly, whether the request is for preliminary or permanent relief is not necessarily dispositive, *see Switzerland Cheese Ass'n, Inc. v. Horne's Market, Inc.*, 385 U.S. 23, 25, 87 S. Ct. 193, 195 (1966), but a failure to seek immediate relief militates against a conclusion that delaying appeal to final judgment inflicts irreparable harm. *See Carson*, 450 U.S. at 84-85, 101 S. Ct. at 997; *Shanks v. City of Dallas, Tex.*, 752 F.2d 1092, 1096 (5th Cir. 1985). CCC has advanced no other reason why requiring it to wait to final judgment for review of the order ruling on standing would have any "serious consequence." We thus conclude that § 1292(a)(1) does not confer jurisdiction.

Nor is the order immediately appealable under the *Cohen* doctrine, the other basis CCC advances. This court has explicitly rejected the argument that a defendant may immediately appeal, under the *Cohen* doctrine, a denial of dismissal for want of

8

standing. *See Summit Med. Assocs., P.C. v. Pryor*, No. 98-6129, slip op. at 3258 (11th Cir. July 15, 1999). While this case presents the mirror image of the issue addressed in *Pryor* — here, it is the *grant* of a dismissal for want of standing — the appellants do not explain why a dismissal for want of standing is any less reviewable on appeal from final judgment than denial of such a dismissal. Like the order in *Pryor*, therefore, this order fails the third prong of the *Cohen* test. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S. Ct. 2454, 2458 (1978) (listing elements). We therefore conclude that we lack jurisdiction over CCC's interlocutory appeal.

B. Appeal from Final Judgment: Summary Judgment on Race Discrimination Claims

　　1. *Standing to Complain of Facilities in Other Schools*.

The plaintiffs object to the district court's conclusion that they lacked standing to complain about inferior facilities and funding at majority-black schools that they did not attend. We conclude that the district court did not err. While it is plain that the plaintiffs have standing to complain of allegedly race-based differences in physical plant and programs that they have personally experienced, they cite no law permitting them to complain of race-based disadvantages experienced only by other people. In the voting rights context, the Supreme Court has held to the contrary that those not actually disadvantaged by a racial classification lack standing to object to it. *See United States v. Hays*, 515 U.S. 737, 743-44, 115 S. Ct. 2431, 2435 (1995) ("[E]ven

if a governmental actor is discriminating on the basis of race, the resulting injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct.") (internal quotations omitted). The district court thus properly dismissed the plaintiffs' claims relating to schools they did not attend.

2. *Merits of Other Claims.*

a. *Overview.* Because of the vagueness of the complaint and the plaintiffs' inadequate briefing of the summary judgment motion and the appeal, the hardest issues in this case have been identifying the claims and what evidence the plaintiffs believe creates a genuine issue of material fact on their discrimination claims. The district court saw six claims: (1) Shaq's claim that she was denied entrance to the T.V. Production/Communication and Broadcasting Program at Hallandale High School for one month in 1994, because of her race; (2) Doe's claim that she was bused[5] because of her race to Edgewood Elementary School during the school year 1995-96; (3) Shaq's claim that Hallandale High School has facilities inferior to other Broward schools because Hallandale is majority black; (4) Shaq's claim that Hallandale receives lower funding than other schools because it is majority

---

[5] The parties use the term "starbursting" to describe the practice of transporting students to schools away from their neighborhoods in order to achieve desired racial ratios. We use the ordinary term "busing," which is what the School Board has always called the practice, according to the deposition of its member Robert Parks.

black; (5) Doe's claim that she was briefly put in a dropout-prevention program because of her race; and (6) Doe's claim that she was denied sufficient textbooks because of her race. An attack on this characterization of the claims does not figure among the plaintiffs' arguments, and we therefore accept it.

These claims fall into groups that are treated a little differently in equal protection law. The first two claims challenge government policies that are explicitly racial: the magnet school racial preference policy and the County's forced integration policy. Because the challenged state action is explicitly racial, the policy is subject to strict scrutiny. *See Adarand v. Peña*, 515 U.S. 200, 227, 115 S. Ct. 2097, 2113 (1995). What that means is that the policy is unconstitutional unless the governmental entity can prove that it has narrowly tailored the policy to serve a compelling interest. *See id.*

The other claims are of disparate treatment; that is, the plaintiffs claim that a governmental entity is treating them differently because of their race, even though the government has not advertised its motives in an explicit policy. To force the governmental entity to prove a compelling interest on this kind of claim, the plaintiffs must show not only racially disparate treatment but also discriminatory purpose. *See Washington v. Davis*, 426 U.S. 229, 238-48, 96 S. Ct. 2040, 2046-50 (1976). We

11

conclude that the plaintiffs have not presented enough evidence of racially discriminatory intent to survive summary judgment.

    *b. Facially racial policies*.

    *I. Busing*. Doe blames her race-targeted busing on the School Board's Policy 5000. That policy, which was approved in 1988 and covered student assignment, stated as one of its objectives the "[m]aintenance of a unitary system" — that is, avoiding resegregation. (Expandable Folder #6, doc. 206, tab 14, at 307.) In establishing school boundaries and attendance areas, the policy directed that "[c]onsideration should be given to the racial/ethnic backgrounds of the student population at each school in order to maintain a unitary school system." (*Id.* at 308.) During the 1995-96 school year, the only year relevant to the remaining claims, the superintendent proposed implementing this policy by busing students such that the percentage of black pupils at each school was within 25 percentage points of the countywide percentage. Doe was in fact bused to Edgewood Elementary School that year (apparently her fifth-grade year) along with several children in her neighborhood.[6] While this evidence does not give us any information about the contours of the busing plan actually adopted, which apparently is not in the record, it

---

    [6] Although this suit as it stands now is only one for damages, Doe testified in her deposition that the only injury she suffered from attending Edgewood Elementary was being hit in the chest by a softball. Doe did not explain the causal connection between the busing and the softball injury.

would permit a jury to conclude that a racial policy existed. For summary judgment purposes, we conclude that the School Board must show that the policy was narrowly tailored to serve a compelling interest.

The School Board justifies this policy by pointing to the 1987 consent decree. The decree stated as the purpose of its provisions the "maintenance of a unitary system of education." (Expandable Folder 6, doc. 206, tab 24, at 2.) While the methods are not described in detail, the decree did obviously contemplate forced integration, in obscure grammar:

> 6. THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA shall implement the following:
>
> > A. That there will be an equal application of methods to ensure that integration will be shared by both black and white students within Broward County, and that the utilization of Magnet Programs, other voluntary programs, and feasible and practical boundary changes will be implemented to achieve such equal application. However, a Bi-Racial Committee, hereinafter provided for, shall review all boundaries on an annual basis for a report to the Board.

(*Id*.) The text of the consent decree is all we have to explain the obligations it imposed. How the School Board construed the consent decree, for instance, to arrive at the policy that resulted in Doe's busing to Edgewood Elementary in 1995-96 is a mystery on the present record. At best we have some recommendations of the superintendent's desegregation task force. They mention goals for racial distribution

13

in the schools, but they do not get into any detail about student assignments designed to achieve those goals.

The School Board's argument and this state of the record present two questions. The first is whether compliance with a consent decree ever qualifies as a compelling interest for Fourteenth Amendment purposes. This is a question of law, capable of resolution on motion for summary judgment. *See Concrete Works of Colorado, Inc. v. Denver*, 36 F.3d 1513, 1522 (10th Cir. 1994). The second question, however, is whether *this* consent decree imposed *this* racial policy; for the reasons that follow, we believe this to be a question of fact unresolved by the current record.

The legal question here — whether compliance with a consent decree of this sort is a compelling interest — answers itself yes, for two reasons. First, consent decrees are a kind of court order. Parties must obey them, therefore, like court orders, and violation is punishable by contempt. *See, e.g., Spallone v. United States*, 493 U.S. 265, 276, 110 S. Ct. 625, 632 (1990). A potential for contempt alone could provide the School Board a compelling interest to observe racial policies. But there is more to the point than that. Any rule that punished the School Board for failing to *disobey* the court would not comport with the sanctity of an unchallenged court order. *See, e.g., W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 766, 103 S. Ct. 2177, 2183 (1983) ("It is

14

beyond question that obedience to judicial orders is an important public policy.");

*Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 439, 96 S. Ct. 2697, 2706 (1976). This sanctity expresses itself in many forms, most strikingly in the collateral order doctrine, which requires a party subject to a court order to comply with it, pending further review, even if the order arguably violates important constitutional rights. *See Walker v. City of Birmingham*, 308 U.S. 307, 315, 87 S. Ct. 1824, 1827 (1967). In other contexts, the law considers an enjoined party to have lost the discretion to contravene a court order. *See GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.*, 445 U.S. 375, 386, 100 S. Ct. 1194, 1201 (1980). And court orders do not bend simply because the enjoined party, by virtue of the order, becomes liable to a third party for damages. *See W.R. Grace & Co.*, 461 U.S. at 769, 103 S. Ct. at 2185. Avoiding contempt and respecting the court that entered the consent decree suffice to make obedience a compelling interest.[7]

But there is a second reason in this case to deem compliance to be a compelling interest. This consent decree rests on a foundation — redressing of past discriminatory wrongs — that the Supreme Court has explicitly recognized as a

_____

[7] The plaintiffs contend that, even if compliance with the decree were a compelling interest in some cases, it should not justify discrimination against them because they were not parties to the litigation that generated the decree. We can't see the logic here; whether or not these plaintiffs are bound by the decree, the School Board obviously is, and the question is whether *the School Board* has a compelling interest.

15

compelling interest by itself when two elements are present.[8] *See Shaw v. Hunt*, 116 S. Ct. 1894, 1902 (1996). The first element is that the past discrimination be "identified." *Id.* The other element is that the government entity have a "strong basis in evidence" to conclude that remedial action was necessary. *Id.* (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277, 106 S. Ct. 1842, 1848 (1986) (plurality opinion)). Here these elements were satisfied at the time of the consent decree. The past discrimination is identified; it was the confinement of blacks to certain schools in the system. *See Allen v. Board of Pub. Instruction*, 312 F. Supp. 1127, 1131 (S.D. Fla. 1970) (finding as fact that 17 of Broward County schools were all black, while another five were more than 99% black). The County also had "sufficient evidence to justify the conclusion that there ha[d] been prior discrimination." *Wygant*, 476 U.S. at 277, 106 S. Ct. at 1848-49 (plurality opinion). There were indeed findings of fact from litigation of the early '70s that Broward County schools were segregated. While the district court believed Broward County to be fully desegregated by 1979, (*see* Order Granting Partial Summ. J. at 4-8, Expandable folder 4, doc. 189, ex. 1), no one has argued here that the 1983 race-discrimination action was unfounded. Complying

---

[8] The School Board has not argued that remedying past discrimination would justify its policies even without a consent decree, so we do not address that issue.

16

with this consent decree in particular thus reflected another compelling interest beyond respect for court orders.

The conclusion that compliance with the consent decree is a compelling interest, however, does not end the summary judgment analysis. Consent decrees are a species of court order, but they are also a kind of contract. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 519, 106 S. Ct. 3063, 3073 (1986). And as is the case in the law of contracts, when a consent decree is ambiguous, we may resort to extrinsic evidence to determine the parties' intent. *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S. Ct. 926, 935 (1975). The consent decree here, which we quoted above, implicitly contemplated integration in the sense of ensuring a black and white mix in the County's schools. Because of this, it may have implied that the School Board should engage in the busing policy of which Doe complains. But we cannot go farther than that on the present record, and that is not far enough.

A contravening compelling interest justifies an explicitly racial policy only when the policy is narrowly tailored to serve that interest. *See Adarand v. Peña*, 515 U.S. 200, 227, 115 S. Ct. 2097, 2113 (1995). When the compelling interest is compliance with a court order, that means that the governmental entity must face a likelihood of contempt under the order if it abandons the racial policy. The reason is

17

obvious: any policy that exceeds the bare requirements of the order no longer closely fits the compelling interest because abandoning the policy is consistent with respecting the court, avoiding contempt liability, and righting the wrongs underlying the decree. In this case, not knowing whether the parties intended the consent decree to compel busing like that imposed on Doe makes it unknowable whether the court would likely have held the School Board in contempt for *refusing* to bus Doe. The School Board has thus not carried its burden on this summary judgment motion of eliminating a genuine issue of fact as to whether it had a compelling interest for Doe's busing during the 1995-96 school year.

### ii. *Magnet school racial quotas.*

Plaintiff Shaq attributes her temporary exclusion from a magnet program to a racial quota system that was in effect in the fall of 1994. That system, which apparently resided in School Board policy 5004, is not in the record, as the district court pointed out. From deposition testimony and the amended 5004 that was proposed in 1996, however, a jury could find that whites were given preference for magnet programs located in majority-black schools, until a certain desired percentage of white pupils was achieved. Shaq has thus presented enough evidence for present purposes to permit the conclusion that this policy was racial and therefore unconstitutional, unless it was narrowly tailored to serve a compelling interest.

18

Here again, as in the case of Doe's busing, the School Board argues that the 1987 consent decree provides a compelling interest. Again, the School Board's proffered evidence leaves doubt as to how the consent decree compelled the racial quotas for magnet programs. There is more of a hint here of the link between the decree and the policy; the decree explicitly mentions magnet programs, albeit in the same obscure grammar:

> 6. THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA shall implement the following:
>
> . . .
>
> B. That Magnet Programs be primarily restricted to traditionally black schools, and that the Plaintiff be provided with a list of all Magnet Programs, real or imagined, their locations, and the current populations of students participating in said programs.

(Expandable Folder 6, doc. 206, tab 24, at 2.) Magnet programs also appeared in the section of the decree addressing integration, which was quoted above, as a method of integration. We could infer that some sort of racial preference would be necessary to achieve the desired desegregation. But what is missing is any evidence that quotas (whose details, as we said earlier, are unclear from this record) — not to mention the actual quota figures that were chosen — were necessary to comply with the consent decree. We thus reach the same conclusion on this claim as we did on the Doe's busing claim: that the School Board has failed to carry its burden on summary

19

judgment to eliminate any genuine issue of fact concerning its defense of a compelling interest.

*c. Disparate treatment claims.*

The remaining claims concern alleged racial distinctions that are not explicit.[9] As we explained above, "official action will not be held unconstitutional solely because it results in racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264-65, 97 S. Ct. 555, 563 (1977). In this summary judgment context, when the defendant has pointed to the absence of evidence of discriminatory intent, it becomes the plaintiffs' job to produce such evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). If the plaintiffs have done so, they have certainly not made it known — their brief to this court takes the district court to task for failing to "examine circumstantial evidence including the historic background of the decision making body, and legislative or administrative history of the decisions," but the plaintiffs have not provided us with a single record cite to any

---

[9] By cunningly culling a quotation from a School Board rule, Doe tries to represent her claim concerning tracking in a dropout prevention program as one arising from a facially racial policy. The policy indeed limits how long pupils of a certain race may be kept apart from pupils of another race, as Doe points out. But immediately above this provision, in all capital letters, the policy (number 5150) behind the rule provides that "STUDENTS SHALL NOT BE ASSIGNED TO ABILITY GROUPS, TRACKS, SPECIAL EDUCATION CLASSES, CLASSES FOR THE MENTALLY RETAINED, OR OTHER CURRICULAR OR EXTRACURRICULAR ACTIVITIES ON THE BASIS OF RACE . . . ." (Expandable folder 6, doc. 206, tab 8.) This policy is thus not only not explicitly racial, it is explicitly *non*racial. Like the other claims discussed in this section, therefore, this claim survives summary judgment only if the plaintiffs have produced sufficient evidence that this nonracial policy rests on a discriminatory purpose.

21

such history, or to any other evidence of discriminatory intent. In the interest of justice, we have nonetheless examined the record for such evidence. The record in fact does not support any assertion of discriminatory intent.

We can start with the background and historical facts that courts properly look to for evidence of intent. *See Rogers v. Lodge*, 458 U.S. 613, 623-27, 102 S. Ct. 3272, 3278-81 (1982). The parties agree that the Broward County schools have been unitary since 1979, and that unitariness came rapidly with good-faith compliance with court-ordered desegregation. In 1987, following a lawsuit by some black parents, the School Board agreed to desegregation measures that, according to the plaintiffs here, were not constitutionally necessary. When other black parents complained about the desegregation measures — such as the busing at issue here — the Board established a desegregation task force to make recommendations. The task force recommended eliminating the busing, which the Board did. Furthermore, when parents complained that suspension rates were higher for black pupils than white, the Board directed that school improvement teams examine suspension practices. Finally, the Board's mission statement is to provide the County's "multi-cultural, diverse population" with "equal educational opportunity." (Expandable folder 1, doc. 91, at 31.) This evidence does not support an inference of discriminatory intent. (Indeed, if anything this evidence depicts a well-meaning Board tiptoeing through a racial minefield.)

22

The plaintiffs' other evidence is no better. The plaintiffs claim that for racial reasons western Broward schools get more money than eastern Broward schools, and thus have better facilities. But in none of the plaintiffs' depositions of School Board members or school staff did the plaintiffs pursue the questions of how the Board distributes money among schools in the County, how funding requests are made, how the Board weighs requests, or how needs and priorities may differ from school to school. In short, they did not elucidate the process in a level of detail that might expose discriminatory intent.[10] Instead, the plaintiffs point only to the disparities between schools that are the basis of their claims. This is just not enough evidence of intent when there are so many imaginable reasons for differences, both global — eastern Broward County neighborhoods are older, and the schools there are older as well — and specific to each spending decision, such as when the Board decides for legitimate reasons that School X needs a new roof more than School Y needs a new gym floor. And as for Doe's claim of racial tracking, the plaintiffs apparently did not depose or seek affidavits from the officials who tracked Doe into an anti-dropout

---

[10] What scanty testimony there is about certain spending items, such as new school construction, is that pupil health and safety, among other concerns peculiar to certain schools, motivated decisions. (*See* Robert Parks Dep. at 51-54.)

23

program. Thus, apart from Doe's say-so[11] we have no idea whether her placement there was for racial or other reasons.

Because there is not enough evidence in the record for a jury to find that the School Board's funding and resource decisions carry a racial taint, or that the School Board or superintendent tracked Doe for racial reasons, the district court properly granted summary judgment on those claims.

## III. Conclusion

For the foregoing reasons, we dismiss the interlocutory appeal of CCC and affirm the district court's summary judgment against Shaq and Doe on their claims for injunctive relief. We reverse, however, the summary judgment entered on Doe's claim for damages for being bused during the 1995-96 school year and Shaq's claim for damages for being denied entry into a magnet program for one month, and we remand for further proceedings on these two damages claims. The district court's judgment is in all other respects affirmed.

NO. 97-5078   AFFIRMED IN PART;   DISMISSED FOR WANT OF APPELLATE JURISDICTION IN PART.

---

[11]   Even on summary judgment, a court is not obliged to take as true testimony that is not based on personal knowledge. *See* Fed. R. Civ. P. 56(e).

NO. 98-4199 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

BARKETT, Circuit Judge, concurring in part and dissenting in part:

I concur in the court's resolution of Shaq and Doe's appeal. I respectfully dissent, however, from the majority's conclusion that the order from which an interlocutory appeal is sought by Citizens Concerned About Our Children ("CCC") is one which cannot be appealed under Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541 (1949). I believe our precedent requires the opposite result. Interlocutory appeals are permitted under the collateral order doctrine if the order appealed from: (1) conclusively determines the disputed question; (2) resolves an important issue completely separate from the merits of the action; and (3) is effectively unreviewable on appeal from a final judgment. See Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 276 (1988) (reiterating the three-prong test of Cohen).

The majority finds that the district court's order fails the third prong of the Cohen test, on the basis of Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326 (11th Cir. 1999). I believe Pryor is not applicable and that this case is controlled by Transamerica Commercial Finance Corp. v. Banton, 970 F.2d 810 (11th Cir. 1992).

In Pryor, the Court found that a defendant may not immediately appeal *a denial* of a motion to dismiss for lack of standing. See Pryor, 180 F.3d at 1334. The majority suggests that a denial of a motion to dismiss for want of standing is no different from a judgment *granting* a motion to dismiss for want of standing. See Maj.

Op. at 8. I find these actions to be significantly different in their consequences. When a district court denies a motion to dismiss, all parties remain in the lawsuit and participate therein. When a district court *grants* the motion, the dismissed party can no longer participate and loses any opportunity to clarify or to affect in any way the ongoing case.

Moreover, this court's precedent has explicitly recognized that excluding a party from the remainder of an ongoing case satisfies the third prong of Cohen. In Transamerica Commercial Finance Corp, 970 F.2d at 814, this Court held that an order dismissing two of the eleven defendants in the case by granting motions for summary and default judgments as a form of sanction was immediately appealable under the collateral order doctrine. The court concluded that such an order, albeit not a final judgment under section 1291, was appealable as an interlocutory order because otherwise it would be effectively unreviewable.[1] As the court noted, "having been severed from the underlying case" the two defendants could lose their opportunity to

---

[1] This does not mean that parties dismissed from an action may always have an interlocutory appeal from a nonfinal order. The order must still fulfill the first two prongs of Cohen, that is it must conclusively determine the disputed question and resolve an important issue completely separate from the merits of the action. In Transamerica, the Court concluded that the district court's order undoubtedly fulfilled the first two Cohen prongs. Similarly, the question whether a party has standing easily fulfills the first two prongs of Cohen because a standing determination is both separate from the merits of a claim and conclusively resolves an important disputed question. See Pryor, 180 F.3d at 1334.

27

appeal for "the remaining defendants may settle or may decide not to appeal." Id. at 815.

In the case at hand, CCC may be subjected to irreparable harm in the absence of an immediate appeal. The district court, in the same order dismissing CCC for lack of standing also denied Shaq and Doe the right to proceed with their claims for injunctive relief. Furthermore, the district court's September 5, 1997 order found that Shaq and Doe did not have standing to challenge the alleged system-wide racial disparities and inequities in the Broward County School system. The district court limited Shaq and Doe's claims to those practices directed towards them only at the schools which they attended. These rulings relating to Shaq and Doe were incorporated in the subsequent final judgment but CCC was not included therein. Therefore, if the issue of CCC's standing is not reviewed in this appeal, the parties will have no avenue through which to challenge the alleged system-wide unconstitutional practices as CCC tried to do in its complaint.

For the foregoing reasons, I would find that this Court has appellate jurisdiction over CCC's interlocutory appeal and should resolve the issues pertaining thereto.