

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-18-2006

# Lomack v. Newark

Precedential or Non-Precedential: Precedential

Docket No. 05-4126

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Lomack v. Newark" (2006). *2006 Decisions.* Paper 393.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/393

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-4126

CHARLES LOMACK; HAROLD J. BANE, JR.; RAMON
DOMINGUEZ; JAMES P. WILLIS; KEVIN L. JOHNSON;
PAUL T. MAZZA; KENNETH REEDS; GARY HOLMAN;
LUTHER ROBERSON, III; GERRELL ELLIOTT;
CLARENCE R. BRUTON; JAMES GILES; DEAN GATTI;
PETER J. COONEY; JOHN P. MELANI; GREGORY
HIGHSMITH; JUAN H. RAMOS; DAYON COBBS; DEBLIN
RODRIGUEZ; RAMON RIVERA; CHARLES H. WEST;
SCOTT WOLF; WILFREDO RIVERA; KARREEM
JACKSON; JOHN BROWN; WYNDELL COOPER;
SHANNON MCTIGHE; ASHTON ROBINSON; MARK
PISERCHIO; CHRIS DEMURO; NEWARK FIREFIGHTERS
UNION; ERIC BARNES; EDWARD GRIFFITH; LEWIS
MANNING; FRANK ZIDZIUNAS, NEWARK
FIREFIGHTERS OFFICERS UNION, INTERNATIONAL
ASSOCIATION OF FIRE FIGTHERS, AFL-CIO, CLC,
LOCAL 1860,

         Appellants

v.

CITY OF NEWARK; SHARPE JAMES; EDWARD
DUNHAM; LOWELL F. JONES; NORMAN J. ESPAROLINI

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
D.C. Civil No. 04-cv-06085
District Judge:  The Honorable John W. Bissell

Argued:  June 29, 2006

Before: BARRY, VAN ANTWERPEN and
JOHN R. GIBSON,[*] Circuit Judges

———————

(Opinion Filed: September 18, 2006 )

———————

David Tykulsker, Esq. (Argued)
David Tykulsker & Associates
161 Walnut Street
Montclair, NJ 07042

Counsel for Appellants


Carolyn A. McIntosh, Esq. (Argued)
Room 316
City of Newark
920 Broad Street
Newark, NJ 07102

Counsel for Appellees


John H. Findley, Esq.
Pacific Legal Foundation
3900 Lennane Drive, Suite 200
Sacramento, CA 95834

Counsel for Amicus-Appellants


———————

[*] The Honorable John R. Gibson, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

2

## OPINION OF THE COURT

BARRY, <u>Circuit Judge</u>

On July 1, 2002, Sharpe James, newly re-elected as Mayor of Newark, New Jersey, issued a "mandate" in his inaugural speech that, "to improve morale," all single-race fire companies in the Newark Fire Department would be eliminated.[1] The racial composition of each of the 108 fire companies was thereafter examined, and dozens of firefighters were involuntarily transferred to different companies solely on the basis of their race. In January 2004, Mayor James announced that "[w]e have created a rainbow at each firehouse." (Pl. App. at 74). The firefighters sued, and lost.

It is important at the outset to note what this case is <u>not</u> about. This case is not about whether diverse workplaces are desirable. It is not disputed that they are. Neither is this case about a remedy for unlawful past discrimination because, again, it is not disputed that there was no unlawful discrimination in the past. And this case is not about whether the numbers of minority firefighters being hired are satisfying long-range hiring goals. Rather, this case is about whether the City of Newark may employ a race-based transfer and assignment policy when any racial imbalance in the 108 fire companies is not the result of past intentional discrimination by the City. We hold that it may not and, accordingly, will reverse the District Court's entry of

---

[1] Mayor James used the term "fire houses," but there is no evidence that there were any single-race fire houses in Newark, and it became clear that the mandate was directed to the 108 fire companies. Each of the fire companies is made up of three or four firefighters working under the supervision of a fire captain in a fire house. Each company works a designated shift known as a tour. The parties use the terms "company" and "tour" to refer to the small group of firefighters working together on a particular shift. We will refer to these groups as "companies."

3

judgment for the defendants.

## I. BACKGROUND AND PROCEDURAL HISTORY

In 1977, the United States filed a complaint against the State of New Jersey, several New Jersey officials, the City of Newark, and eleven other New Jersey cities alleging "a pattern or practice of discrimination" in the hiring and promotion of minority firefighters. A Consent Decree resolving the United States' claims was approved and entered by the District Court in 1980. The Consent Decree did not contain a finding that any unlawful discrimination had occurred, but did require the various defendants "to undertake affirmative action to increase substantially the proportion of black and Hispanic personnel on their respective fire departments." With respect to the Newark Fire Department, the Decree called for an interim goal of at least 60% of all vacancies to be filled with qualified minority candidates.

Fifteen years passed, and in 1995, the Newark City Council hired Samuel Rosenfarb, a certified public accountant, to "determine [statistical] compliance with [the 1980] consent decree." (Supp. App. at 90.) Rosenfarb reported his findings to the Council in a December 1995 report, which indicated that 68.8% of the Fire Department's uniformed employees were white, 24% were black, and 6.9% were Hispanic. He also reported that of 195 promotions granted between 1980 and 1994, 168 were given to white employees, twenty-four to black employees and three to Hispanic employees. In conducting his analysis, Rosenfarb noticed that "the [companies] were significantly homogenous either black or white." (*Id.*) His report noted that 81 of the 108 companies "had a majority of white personnel with 30 being comprised entirely of white personnel. Fifteen of the [companies] were predominantly black . . . . Only one . . . had a majority of hispanics. The remaining eleven [companies] did not contain a majority of any one group." (Pl. App. at 124.)[2]

_____

[2] Also in 1995, the Council retained Lesli Baskerville, an attorney, "for the purpose of examining legal documents relating

The City took no action with respect to the existence of single-race fire companies for another seven years. Then, in July 2002, Mayor James, apparently out of the blue, ordered that all fire houses, i.e., companies, in the Newark Fire Department be integrated "to improve morale" and "to honor a court order to make our Fire Department the mirror of the City of Newark . . . ." (*Id.* at 55). With reference to the former, we note, there is no evidence that morale needed improving; with reference to the latter, the by-then twenty-two year old Consent Decree required no such thing.

The Mayor appointed the Department's former Affirmative Action Specialist, Edward Dunham, as the new Director of the Fire Department, and charged him with implementing this "diversification order." (*Id.* at 54.) Dunham, in turn, directed Fire Chief Lowell Jones to diversify the fire companies. In a November 27, 2002 letter to Chief Jones, Dunham directed Jones to "formulate a mass departmental transfer list." (*Id.* at 56.) Jones did so, and in so doing, "tried to achieve an element of diversity as well as assign department personnel as per their specialized training." (*Id.* at 57.) He also considered the "need to maintain a high degree of readiness in [the] face of world and/or domestic terrorist threats." (*Id.*) In his memorandum to Dunham, he noted that "[u]nits that have been training together and that have achieved a high level of efficiency [were] maintained and where we could comply with diversity we did so."[3] (*Id.*)

---

to the Consent Decree." (Pl. App. at 170.) Her report was not admitted into evidence, its only purpose being to show what action, if any, the City and the Fire Department took in response thereto. Accordingly, and unlike the District Court, we neither note nor rely on any of the factual allegations contained in the report.

[3] In his testimony at trial, Jones indicated that he used the "probationary firefighters that came out of the training division, as well as some of the [voluntary] transfer requests that were made, to try to incorporate an element of diversity." (Supp. App. at 37-38; Pl. App. at 242.) His list did not include any

Dunham asked Battalion Chief Raymond Wallace to review Jones's list, and Wallace determined that the list would not achieve the mandated diversity. He noted in a memorandum to Dunham that "[i]f Chief Jones transfer list were to be used, there would be <u>14 companies all Caucasian and 10 companies African American.</u> . . . This list does not meet the directive and is unsatisfactory." (*Id.* at 61 (emphasis in original).) Accordingly, Wallace proposed an alternative transfer list that would achieve 100% diversity. Dunham accepted Wallace's proposal. On January 15, 2003, Dunham issued "Executive Order No. 426—Transfers & Assignments," in which he announced a list of transfers "effective at 0800 hours on Friday, January 31, 2003," and stated that "[f]uture transfer requests will not be accepted until further notice." (*Id.* at 67-70.)

Thirty-four firefighters who were involuntarily transferred or denied requests to transfer due to the new policy, together with the Newark Firefighters Union and the Newark Fire Officers Union, brought this action against the City of Newark, Mayor James, and three officials of the Newark Fire Department, challenging the constitutionality of the policy under the Equal Protection Clause; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 & 10-6:2. Following a bench trial, the District Court dismissed their claims and entered judgment for defendants. This timely appeal followed.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Because the diversity policy is a race-based classification, it must pass strict scrutiny: it must be narrowly tailored to achieve a compelling state interest. *See Johnson v. California*, 543 U.S. 499, 506 (2005) (explaining that "'racial classifications receive close scrutiny even when they may be said to burden or benefit the races equally.'") (quoting *Shaw v. Reno*, 509 U.S. 630, 651 (1993)). The District Court found that the policy satisfied both prongs of this test. We review the

involuntary transfers.

6

District Court's findings of fact for clear error. *Contractors Ass'n of Eastern Pa. v. City of Philadelphia*, 91 F.3d 586, 596 (3d Cir. 1996). The existence of a compelling state interest, however, is a question of law that is subject to plenary review. *Id.*

## III. ANALYSIS

The City argues that it has three somewhat interwoven compelling interests in implementing the diversity policy. First, it argues that it has a compelling interest in eliminating *de facto* segregation in the Fire Department. Second, it contends that there is a compelling interest in securing the "educational, sociological and job performance" benefits of diverse fire companies. Finally, it argues that the policy is required by the 1980 Consent Decree, compliance with which constitutes a compelling interest. As we have already suggested, we are not persuaded by these arguments. We will address each in turn.

### 1. Remedying Past Discrimination

It is well settled that a government has a compelling interest in remedying its own past discrimination. *See, e.g.*, *United States v. Paradise*, 480 U.S. 149, 167 (1987). Accordingly, it may employ racial classifications to cure racial imbalances—but only if it can prove that it engaged in prior intentional discrimination or was a "passive participant" in a third party's discrimination. *Richmond v. J. A. Croson Co.*, 488 U.S. 469, 492 (1989). "[R]ace-based preferences cannot be justified by reference to past 'societal' discrimination in which the municipality played no material role." *Contractors Ass'n*, 91 F.3d at 596; *see also Shaw v. Hunt*, 517 U.S. 899, 909-12 (1996) (rejecting racial classifications to "alleviate the effects of societal discrimination" in the absence of findings of past discrimination, and to promote minority representation in Congress); *Richmond*, 488 U.S. at 511 (1989); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274-76 (1986) (rejecting racial classifications in a teacher layoff policy aimed at providing minority role models for students and alleviating past societal discrimination).

The City does not even suggest that it participated,

7

directly or passively, in any form of discrimination; indeed, it concedes that it neither intentionally discriminated against minority firefighters with respect to assignments or transfers, nor intentionally segregated firefighters into racially homogeneous companies. Moreover, the City concedes that single race fire companies resulted, not from "Fire Department management," but from the "tendency on the part of management to allow people to work where they choose to work," and to accommodate their desire to work in the neighborhoods where they live. (Pl. App. at 334, 335). Accordingly, the remedial justification for the use of racial classifications is wholly inapplicable here, and the District Court's finding to the contrary is clearly erroneous.

The City nevertheless argues that it can employ a racial classification to eliminate what it characterizes as "*de facto* segregation" in the Fire Department. *De facto* segregation is defined as "[s]egregation which is inadvertent . . . and not caused by any state action." *Black's Law Dictionary* (6th ed.); *see also Washington v. Davis*, 426 U.S. 229, 240 (1976) ("'The differentiating factor between de jure segregation and so-called de facto segregation . . . is purpose or intent to segregate.'") (quoting *Keyes v. School Dist. No. 1*, 413 U.S. 189, 208 (1973)); Reginald Oh, *Race Jurisprudence and the Supreme Court: Where Do We Go From Here?: Discrimination and Distrust*, 7 U. PA. J. CONST. L. 837, 859-860 (2005) ("[D]e facto segregation is considered a 'nondiscriminatory' form of segregation.").[4] The City relies on *Brown v. Board of*

_____

[4] It has been noted that the term "*de facto* segregation" is somewhat of an oxymoron because "'segregate' is a transitive verb [that] requires an actor to do an act which effects segregation." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist.*, 426 F.3d 1162, 1196-97 (9th Cir. 2005) (Bea, J., dissenting); *see also id.* at 1198 ("It should be remembered . . . that one can no more 'segregate' without a person actively doing the segregation than one can separate an egg without a cook."). Judge Bea also noted that this "rhetorical ploy" is "clearly understandable" since it is "much easier to argue for measures to end 'segregation' than for measures to end 'racial imbalance.'

8

*Education*, 347 U.S. 483 (1954), to support its assertion that government has a compelling interest in eliminating *de facto* segregation. This reliance is misplaced. *Brown* involved *de jure* (*i.e.*, intentional) segregation.[5] In *Brown*, and in the later desegregation cases, the Supreme Court held that the remediation of *de jure* segregation justifies the use of a racial classification. This holding has never been extended to encompass unintentional – *de facto* – segregation. Accordingly, while we agree with the City that the elimination of *de facto* segregation may well benefit individual employees and society at large and is, indeed, a laudable goal, we cannot agree that doing so constitutes a compelling interest that can be achieved by means of a racial classification.

### 2. Educational and Sociological Benefits of Diverse Fire Companies

In *Grutter v. Bollinger*, 539 U.S. 306 (2003), the Supreme Court clarified that non-remedial goals may also justify race-based classifications in certain circumstances. *Id.* at 328 ("It is true that some language in [earlier] opinions might be read to suggest that remedying past discrimination is the only permissible justification for race-based governmental action. . . . But we have never held that the only governmental use of race that can survive strict scrutiny is remedying past discrimination."). Specifically, the *Grutter* Court held—quite narrowly—that the "educational benefits" of a diverse student

---

Especially is this so in view of the U.S. Supreme Court's frequent pronouncements that 'racial balancing' violates the Equal Protection Clause." *Id.* at 1197, 1198.

[5] In direct contrast to *de facto* segregation, "[t]he essential element of de jure segregation is 'a current condition of segregation resulting from intentional state action.'" *Washington*, 426 U.S. at 240 (quoting *Keyes,*, 413 U.S. at 205); *see also* 3 Ronald D. Rotunda & John E. Nowack, *Treatise on Constitutional Law* § 18.9(2)(1) (3d ed. 1999) ("De jure ('by law') segregation is racial separation which is the product of some purposeful act by government authorities.").

body are a sufficiently compelling interest to justify race-based enhancements of minority students' applications to law school.[6] *Id.* at 328-33.

The City argues that it has a compelling interest in integrating its fire companies because "integration in the workplace is no less important than in an educational setting." (Appellees' Br. at 30.) Specifically, it contends that "integration in fire companies leads to greater camaraderie between coworkers, acceptance and consideration for people of varying backgrounds, sharing of information and study support. It also promotes tolerance and mutual respect among colleagues." (*Id.*) The District Court agreed, as do we, but went on to find that the "educational, sociological, and job-performance enhancements" supported, if not by themselves compelled, the diversity policy. With that, we disagree.

Initially we note that the under-inclusiveness of the diversity policy, specifically its failure to consider gender, other ethnic groups, age, or socio-economic class, seems to belie Newark's claim that "educational benefits" were its actual purpose.[7] It bears mention, as well, that neither Mayor James nor the Fire Department officials called upon to implement the

---

[6] The Court accepted the argument of the school and various amici that the University of Michigan Law School needed to enroll a "critical mass" of minority students in order to fulfill its educational mission and prepare students for successful careers in an increasingly diverse workforce. *Id.* at 330. The Court agreed that it was essential for students to be exposed to "widely diverse people, cultures, ideas, and viewpoints," *id.*, and that it was "necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity" in order to "cultivate a set of leaders with legitimacy in the eyes of the citizenry," *id.* at 332.

[7] "To be a compelling interest, the State must show that the alleged objective was the legislature's actual purpose for the discriminatory classification." *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) (internal quotation marks and citations omitted).

10

diversity policy referred to "educational benefits" or anything akin thereto as a reason for the policy. By accepting educational benefits as an interest compelling the policy, however, the District Court, at least implicitly, found that that was the City's "actual purpose," or at least one of its purposes.

We need not resolve whether or not the District Court's finding was clearly erroneous, because even if the alleged "educational benefits" were an "actual purpose," they do not constitute a compelling interest in the circumstances presented by this case. While *Grutter* established that educational benefits are compelling *in a law school context*, we do not find its holding applicable in the firefighting context. *See Grutter*, 539 U.S. at 327 ("Context matters when reviewing race-based governmental action under the Equal Protection Clause.").

The "relevant difference," *id.*, between a law school and a fire department is their respective missions. The mission of a school is to educate students, "prepar[e] students for work and citizenship," and cultivate future leaders. *Id.* at 331, 332. The *Grutter* Court found, based on extensive testimony and other evidence, that a "critical mass" of diverse students was necessary for the University of Michigan Law School to effectively achieve this mission. But *Grutter* does not stand for the proposition that the educational benefits of diversity are *always* a compelling interest, regardless of the context. Rather, it stands for the narrow premise that the educational benefits of diversity can be a compelling interest to an institution whose mission is to educate.

The Fire Department's mission is not to educate. Its mission is "the control, fighting and extinguishment of any conflagration which occurs within the city limits." Newark, N.J. General Ordinances v. I, tit. II, ch. 21, § 1.2 (2005). Accordingly, *Grutter*'s holding regarding a compelling interest in the educational benefits of diversity is unavailing here. And, we note, the City does not argue that diversity within individual fire companies is in any other way necessary, or even beneficial, to the Fire Department's mission of fighting fires, *i.e.*, that the

11

Department has an operational need for diverse fire companies,[8] and we do not read the City's assertions of increased "camaraderie," "acceptance," and "tolerance" as making such an argument. Even if we were to liberally construe those assertions as an operational needs argument, however, utterly no evidence supports it. *See Patrolmen's Benevolent Ass'n*, 310 F.3d at 52-53 (citations omitted) ("[C]ourts recognizing the [operational needs] defense have required the government actor to demonstrate that it is 'motivated by a truly powerful and worthy concern and that the racial measure . . . adopted is a plainly apt response to that concern.' The justification must be substantiated by objective evidence . . . .").

In sum, we conclude that the benefits of diversity, as set forth by the City, are not a compelling interest that justifies its diversity policy.

### 3. Compliance With the 1980 Consent Decree

The City also argues that compliance with the 1980 Consent Decree constitutes a compelling interest. This, too, is unavailing. Compliance with a consent decree may certainly be a compelling interest, *see Citizens Concerned About Our Children v. Sch. Bd. of Broward County, Florida*, 193 F.3d

---

[8] Courts have found such "operational needs" arguments to be persuasive in the law enforcement context. *See, e.g.*, *Petit v. City of Chicago*, 352 F.3d 1111, 1114 (7th Cir. 2004) (finding a "compelling operational need for a diverse police department" in a "racially and ethnically divided major American city"); *Patrolmen's Benevolent Ass'n v. New York*, 310 F.3d 43, 52 (2d Cir. 2002) ("We have recognized that 'a law enforcement body's need to carry out its mission effectively, with a workforce that appears unbiased, is able to communicate with the public and is respected by the community it serves,' may constitute a compelling state interest."). In a sense, *Grutter* could itself be characterized as an "operational needs" opinion. The Supreme Court essentially found that law schools have an operational need for a diverse student body in order to effectively achieve their educational mission.

1285, 1292-94 (11th Cir. 1999) (explaining that violation of a consent decree "is punishable by contempt," and "[a]voiding contempt and respecting the court that entered the consent decree suffice to make obedience a compelling interest"), but only if the decree *mandates* the race-based policy at issue:

> When the compelling interest is compliance with a court order, that means that the governmental entity must face a likelihood of contempt under the order if it abandons the racial policy. The reason is obvious: any policy that exceeds the bare requirements of the order no longer closely fits the compelling interest because abandoning the policy is consistent with respecting the court, avoiding contempt liability, and righting the wrongs underlying the decree.

*Id.* at 1293.

The Consent Decree says nothing about the diversity policy at issue here, much less does it *require* the City to engage in that policy. The Decree establishes policies and benchmarks for the hiring and promotion of minority firefighters, with the only language even arguably relevant here found in one paragraph of the twelve-page Decree where the defendants were prohibited from making unlawfully discriminatory assignments. Reading a complete diversity requirement into that prohibition, however, particularly where, as here, it is conceded that there was no unlawful discrimination, would stretch that language beyond its logical or intended limits. Fire Department officials effectively admit as much. Stanley Kossup, Director of the Fire Department from 1988 to 2002, testified that he did not believe that the existence of single-race fire companies violated the Consent Decree. Similarly, Edward Dunham, who served as Director of the Fire Department from 2002 to 2004 after serving as the Affirmative Action Officer in the late 1990s, testified that the Consent Decree did not mandate the elimination of single-race fire companies and that issue of single-race companies "never came up" before the "consent decree committee" on which he served. (*Id.* at 308.)

13

#### 4. Summary of Compelling Interest

In the concluding paragraphs of its analysis, the District Court implied that the three interests—remedying past discrimination, educational and sociological benefits of diversity, and compliance with the Consent Decree—together constitute a compelling interest. (*Id.* at 34 ("When one 'strictly scrutinizes' the Newark transfer policy and finds it to be designed to eliminate de facto segregation in its firehouses, in pursuit of the mandate of the Consent Decree to which it was a party, with attendant educational, sociological and job-performance enhancements as well, one is led to the inevitable conclusion that this policy was implemented to achieve a 'compelling interest' of the City.").) As explained above, however, we simply cannot conclude that, individually or in the aggregate, these interests are compelling.[9]

### III. CONCLUSION

We conclude this opinion as we began, by reiterating what this case is <u>not</u> about. It is not about remedying intentional discrimination in the Newark Fire Department. It is not about improving the Department's ability to extinguish fires. It is not about whether diverse work places are good for employees or for society or whether long-range hiring goals are being met. This case is about whether Newark can "create[] a rainbow" in each of the 108 companies solely by means of a racial classification. We hold that it cannot. Racial balancing, and that is what this is, simply cannot be achieved by means of a racial classification without running afoul of the Equal Protection Clause of the Constitution. *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) (explaining that "outright racial balancing . . . is patently unconstitutional"); *see also Freeman v. Pitts*, 503 U.S. 467, 494 (1992) ("Racial balance is not to be achieved for its own sake."). Accordingly, we will reverse the order of the District Court, and remand for further proceedings consistent with this opinion.

---

[9] Because we find that the diversity policy does not further a compelling state interest, we need not determine whether the policy is narrowly tailored.

14