[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-11063

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 23, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 98-00063-CV-3-CDL-6


SHERNIKA HOLTON,
SPENCER WILSON, et al.,

                                             Plaintiffs-Appellants,
                                             Cross-Appellees,


                         versus


CITY OF THOMASVILLE SCHOOL DISTRICT,

                                             Defendant-Appellee,
                                             Cross-Appellant.


_____

Appeals from the United States District Court
for the Middle District of Georgia

_____

(September 23, 2005)

Before BARKETT, MARCUS and SUHRHEINRICH[*], Circuit Judges.

MARCUS, Circuit Judge:

At issue in this class action lawsuit is whether the City of Thomasville School District ("the District") has satisfied its constitutional obligation to dismantle its former de jure racially segregated school system. The Plaintiffs -- Shernika Holton and ten other representative parents of black children attending elementary, middle, and high schools operated by the District, and the Thomas County Branch of the NAACP -- allege that the District has failed to do so, and request that judicial supervision of the District's desegregation efforts be imposed.

After a lengthy bench trial, the district court found that racial imbalances existed in several areas of the District's operations, but that these imbalances were neither traceable to prior de jure segregation nor the result of present intentional discrimination. Accordingly, the district court concluded that the District had satisfied its constitutional obligation to desegregate. For the most part, we can discern no error in the district court's findings of fact or its application of the law. However, as to the Plaintiffs' claim that the District's use of "ability grouping" to determine classroom assignments discriminates on the basis of race, we conclude that the district court failed to apply the legal standard long accepted in this Circuit,

---

[*]Honorable Richard F. Suhrheinrich, United States Circuit Judge for the Sixth Circuit, sitting by designation.

and that this legal error tainted its findings of fact. Accordingly, we affirm in part, reverse in part, and remand for reconsideration of the ability-grouping issue in light of the correct legal standard.

## I.

Notably, this case differs from the other school desegregation cases that have come before us in recent years, in that the City of Thomasville School District has never operated under any court-imposed desegregation order or other court supervision. Indeed, this lawsuit is the first desegregation suit ever brought against the District. Because no court has ever imposed a desegregation order on the District, we face whether it is appropriate to do so for the first time now.

Specifically, the Plaintiffs raise two broad causes of action. First, they claim that the District "has perpetuated, failed to disestablish and maintained purposefully racially segregated and unequal public schools . . . and, thus, has acted contrary to the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983." Second, they allege that the District "has perpetuated and failed to disestablish racially segregated public schools . . . , has acted with the purpose and effect of subjecting Plaintiffs to discrimination in a federally funded program and, thus, has acted contrary to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §

3

2000d, and implementing regulations at 34 C.F.R. Part 100."[1]

The Plaintiffs seek a permanent injunction requiring the District to (a) disestablish its racially segregated school system; (b) adopt and implement a plan effectively to desegregate its buildings and classrooms; (c) provide equal educational facilities, resources, materials, and instruction to all students, and to provide compensatory instruction to students previously denied that opportunity; (d) cease all discriminatory imposition of discipline; and (e) desegregate all student activities, and cease discrimination against black students in this area.

The district court certified a class of "all present and future parents or guardians of African American children enrolled or eligible to be enrolled within the Thomasville City School District." Thomas County Branch of N.A.A.C.P. v. Thomasville City Sch. Dist., 187 F.R.D. 690, 700 (M.D. Ga. 1999). It later denied Defendant's motions for summary judgment and to reconsider class certification. Thomas County Branch of N.A.A.C.P. v. Thomasville City Sch. Dist., No. 6:98-CV-63, 2003 WL 169758, at *3 (M.D. Ga. Jan. 21, 2003) (unpublished). In the

---

[1]The district court grouped these claims together, observing that "[i]f [the District's] actions are found to violate Plaintiffs' rights to equal protection, Defendant will also be liable under Title VI." Thomas County NAACP, 299 F. Supp. 2d at 1366 (citing Gratz v. Bollinger, 539 U.S. 244, 276 n.23, 123 S. Ct. 2411, 156 L. Ed. 2d 257 (2003), which provides that "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI"). On appeal, the Plaintiffs do not argue that Title VI has any distinct application; accordingly, like the district court, we treat the two causes of action as being coextensive.

same order, the district court granted Plaintiffs' motion for partial summary judgment, finding that under Eleventh Circuit precedent, any present racial imbalances in the District are presumptively the result of the District's previous de jure segregation. Id. at *2.

Thereafter, the district court tried the case without a jury from July 21 to August 6, 2003. Based on the evidence presented, the trial judge made a series of detailed factual findings. We repeat just the basics here, as these findings are laid out with great clarity and detail in the district court's order, dated February 5, 2004. See Thomas County Branch of N.A.A.C.P. v. City of Thomasville Sch. Dist., 299 F. Supp. 2d 1340 (M.D. Fla. 2004) ("Thomas County NAACP").

First, as background, the district court outlined the history of the District's desegregation efforts, including numerous reorganizations of the District's schools. At the time the Supreme Court issued its seminal opinion in Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954), declaring that racial segregation in public schools violated the Equal Protection Clause of the Fourteenth Amendment, the District was operating a de jure segregated school system. Until 1965, the District's schools remained segregated, with two elementary schools (grades 1-6) serving black students and four serving white students, as well one high school (grades 7-12) for black students and another for

5

white students.

Following the passage of the Civil Rights Act of 1964, the District adopted its first desegregation plan, which became effective at the start of the 1965-66 school year. The plan was based upon freedom of choice, permitting parents to elect which school their children would attend. This method failed to accomplish any desegregation, and the District's historically black schools remained all black.

A series of exchanges between the District and the Department of Health, Education, and Welfare ("HEW") ensued, culminating in the District's adoption of a new desegregation plan in 1970. This plan created a single high school for all students in grades 9-12, regardless of race; a single middle school for all students in grades 7-8, regardless of race; a single school for all students in grade 6, regardless of race; a single school for all students in grade 5, regardless of race; and four elementary schools among which all students in grades 1-4 could select based on freedom of choice. The plan further provided that "[i]f the 'freedom of choice' plan does not eliminate the racial identifiability of each of the four elementary schools, alternate steps will be taken to give this assurance." HEW found that the plan would accomplish the purposes of Title VI and accepted the plan on July 1, 1970.

Some reconfiguration of the District's schools occurred between 1970 and

6

1993, and by the start of the 1993-94 school year, the District was operating four elementary schools serving grades 1-5 (Douglass, Harper, Jerger, and Scott), one middle school serving grades 6-8 (McIntyre Park), and one high school for grades 9-12 (Thomasville High). At the end of the 2001-02 school year, Douglass Elementary School closed, and since then the District has maintained the remaining three elementary schools, as well as its single middle and high schools.

After providing this background, the district court went on to make detailed findings of fact concerning racial imbalances in various areas of the District's operations. The district court found racial imbalances to exist in these areas: the student populations of the District's elementary schools; the composition of some individual classes within the District's schools; the faculty assigned to the District's elementary schools; the staff assigned to some of the District's schools; the composition of the student population participating in the District's gifted and special education programs; and possibly the number of students subjected to disciplinary actions.

Regarding the first area -- student populations of the District's elementary schools -- the district court found that two schools were "racially identifiable," meaning that the percentage of black students enrolled varied more than twenty percent from the district-wide percentage of black students in the grades served by

the school. Harper, the district court found, was an identifiably black school, whereas Jerger was an identifiably white school. In the school year 2002-03, for example, the district-wide percentage of black students was 73.6, while Harper's student body was 98.5% black and Jerger's was 39.8% black. Scott, the single non-racially identifiable elementary school, had a student population that was 90% black.

The district court found, however, that these racial imbalances were not traceable in any proximate way to the District's former de jure segregated school system. Notably, from 1970 (when the District adopted its second desegregation plan) until 1976, the black student population of at least three of the four elementary schools the District then operated "closely tracked the percentage of black students in the District as a whole." Thomas County NAACP, 299 F. Supp. 2d at 1355. During that period, no student attended a school whose black student population varied by more than twenty percent from the district-wide percentage of black students.

The district court supplied this table to illustrate the data:

|  | Percentage of Black Students | | | | |
| School Year | District, Grades 1-4 | Balfour | Harper | Jerger | Scott |
|---|---|---|---|---|---|
| 1970-71 | 57.4 | 53.4 | 63.2 | 60.1 | 54.9 |
| 1971-72 | 62.4 | 58.3 | 72.1 | 68.8 | 56.1 |
| 1972-73 | 65.9 | 57.8 | 82.5 | 66.8 | 61.1 |
| 1973-74 | 67.8 | 64.7 | 83.2 | 68.9 | 59.2 |
| 1974-75 | 66.3 | 66.1 | 85.6 | 66.8 | 55.3 |
| 1975-76 | 67.9 | 73.0 | 87.3 | 63.5 | 56.1 |

The racial imbalances that subsequently developed within the District's schools, the district court found, were the result of pronounced enrollment and demographic changes in the school District. Following the implementation of the 1970 desegregation plan, the district court observed, white enrollment in the District's schools declined substantially, while black enrollment remained fairly stable. From the 1970-71 school year to the 1977-78 school year, black students went from constituting 51.74% to 65.78% of the District's enrollees.

In addition, the City of Thomasville experienced population shifts during that period. In 1970, the City's black population was concentrated primarily in the City's southwestern sector, and since that time, the distribution of Thomasville's black population has changed. For example, Harper elementary school was "surrounded by some predominantly white communities" in 1970, but by 1980,

9

that area had become almost entirely black, and by 1990, "there were few, if any, white students left in the area." Id. at 1356. As the neighborhoods around Harper became increasingly black, so did Harper's student population. The district court explained that "demographics overtook the Desegregation Plan," so that Harper's variance from the district-wide enrollment of black students went from 6% in 1970 to almost 20% in 1975. Id. Meanwhile, the District's other elementary schools varied by no more than 11% in this respect.

The disparity at Harper came to the attention of HEW, and on May 13, 1975, it sent a letter to the District's Superintendent advising that the U.S. District Court for the District of Columbia had ordered it in Adams v. Weinberger, 391 F. Supp. 269 (D.D.C. 1975), to put school districts on notice "to rebut or explain the substantial racial disproportion in one or more of the district's schools." HEW stated that "The court defined a racially disproportionate school as one in which a '20 percent disproportion exists between the percentage of local minority pupils in the schools and the percentage in the entire school district.'" Several exchanges between the District and HEW followed, and the District explained its student assignment procedures to HEW in these terms:

> Assignments are based upon freedom of choice, modified only to the extent hereinafter stated. Freedom of choice forms are issued to all pupils each year. If a school reaches its capacity, priority is given to the child nearest the school. If a parent or student fails to return the

10

form, the student is assigned by school officials to the school nearest the student's home which has not been filled to capacity. In order to maximize a biracial complexion in the Harper School, freedom of choice is modified in two respects: (a) Whites residing in the Harper area have been required to attend Harper notwithstanding their selection of another school under freedom of choice[;] (b) Priority has been given to whites desiring to attend Harper as against blacks residing closer to that school.

After receiving this explanation and other information, HEW "determined that no further student desegregation is required of [the District] at this time." On November 17, 1975, HEW found the District"in compliance with Title VI of the Civil Rights Act of 1964 relative to assignment of students . . . to schools." However, HEW also noted that the situation at Harper warranted monitoring.

Beginning in 1977, racial imbalances in the District's elementary schools began gradually to increase. No formal plan was adopted by the District to address these imbalances, but in 1994, the District created a task force to consider the issue. The task force made consensus recommendations regarding a new process for assigning students to elementary schools. The District implemented these recommendations, with a few modifications, in 1995. The new assignment process is based primarily on parent preferences. If space does not permit accommodation of all preferences, a priority system based on special education considerations, sibling placement, and residency, determines the assignment.

Based on this history and data, the district court concluded that two

11

elementary schools -- Harper and Jerger -- "are clearly racially identifiable schools." Thomas County NAACP, 299 F. Supp. 2d at 1358. To illustrate the data supporting this conclusion, the court supplied this table:

| School Year | Percentage of Black Students | | | | |
| --- | --- | --- | --- | --- | --- |
| | District | Harper | Jerger | Scott | Douglass |
| 1999-2000 | 74.3 | 100 | 39.1 | 84.1 | 99.6 |
| 2000-2001 | 75.2 | 100 | 40.3 | 88.6 | 100 |
| 2001-2002 | 76.0 | 99.3 | 41.7 | 88.7 | 100 |
| 2002-2003 | 73.6 | 98.5 | 39.8 | 90.9 | Closed |

Nevertheless, the court found,"that the racial composition of the District's elementary schools is currently 'imbalanced' because of changes in the racial makeup of the City of Thomasville, shifting housing patterns, and changes in the enrollment of the District's schools caused by declining white enrollment as compared to black enrollment." Id. Moreover, the court found "that the current racial imbalances of the District's elementary schools are not due to any intentional discrimination on the part of the District and are not vestiges of the District's previous de jure racially segregated system." Id.

As to the second racially imbalanced area of the District's operations -- individual classes within its schools -- the district court found the imbalances to be the result of the District's use of "ability grouping" or "tracking" to assign students

12

to classes.[2]  The District, the court explained, begins to group students into classes based on their perceived abilities as early as kindergarten.  As a result, the court observed:

> Regrettably, a disproportionate number of low income children (most of whom happen to be black) are placed in the lower ability groups.  The Court finds that these placements are not being made due to the race of the student.  Many of these low income students are simply perceived as not being prepared with they first arrive at school.  Due to their impoverished environment, they do not receive the background and support that is often so critical for being ready to learn.  Tragically, it appears that for many of these children, the "die is cast" as early as kindergarten.  These children do not appear to be reevaluated (and thus potentially "re-tracked") during their progression through the system.  The inevitable result therefore is that they remain in the "lower ability" track for the duration of their educational careers, absent parental intervention.

Id.

The district court made "no finding as to whether some placements may be affected by the subtle racism of low expectations," but concluded that the District does not manipulate the tracking system to track based on race, and that "intentional racial discrimination is not the reason for placement decisions."  Id. at 1358 n.21.

---

[2]The district court did not make findings as to the precise racial composition of classes within the District.  The court simply observed that "Plaintiffs presented evidence at trial that many of the less academically advanced classes in the District's schools are predominantly black while most of the more academically advanced classes are predominantly white.  The Court finds that Plaintiffs presented sufficient evidence of racial imbalances in certain classes to require the District to rebut the presumption that those imbalances are traceable to the District's previous de jure segregated system."  Thomas County NAACP, 299 F. Supp. 2d at 1358.

13

Regarding the third area of racial imbalance -- the District's faculty -- the district court found that the imbalances were "not traceable in a proximate way to the District's previous de jure segregated system." Id. at 1360. The most recent available data, the district court observed, indeed showed racial imbalances within the faculty:

| School Year | Percentage of Black Faculty | | | |
|---|---|---|---|---|
| | District | Harper | Jerger | Scott |
| 1999-2000 | 36.0 | 68.0 | 9.7 | 24.2 |
| 2000-2001 | 32.4 | 65.2 | 10.8 | 18.2 |
| 2001-2002 | 29.7 | 76.2 | 8.6 | 8.3 |
| 2002-2003 | 26.0 | 58.8 | 8.8 | 11.1 |

Nevertheless, the court observed, the District made "remarkable progress" in desegregating its faculty following the implementation of its 1970 desegregation plan, so that for more than 10 years afterwards, no elementary school had a percentage of black faculty members that varied more than 15% from the district-wide percentage of black elementary faculty. Id. The court illustrated the data this way:

| | Percentage of Black Faculty | | | | |
|---|---|---|---|---|---|
| School Year | District | Balfour | Scott | Jerger | Harper |
| 1970-1971 | 44.2 | 42.9 | 43.5 | 31.3 | 45.5 |
| 1971-1972 | 43.4 | 46.2 | 36.4 | 37.5 | 45.5 |
| 1972-1973 | 47.3 | 46.2 | 42.1 | 40.0 | 54.5 |
| 1973-1974 | 43.2 | 42.9 | 36.8 | 35.3 | 41.7 |
| 1974-1975 | 45.7 | 42.9 | 36.8 | 41.2 | 54.5 |
| 1975-1976 | 41.1 | 40.0 | 40.0 | 41.2 | 45.5 |
| 1978-1979[3] | 41.1 | 35.7 | 42.9 | 37.5 | 38.5 |
| 1979-1980 | 43.3 | 38.5 | 40.9 | 35.3 | 46.2 |
| 1980-1981 | 39.3 | 36.4 | 39.1 | 35.3 | 42.9 |
| 1981-1982 | 36.2 | 30.8 | 43.5 | 35.3 | 35.7 |

Based on this data, the district court found that "the District's Desegregation Plan effectively desegregated the District's faculty," and that the faculty assignment system is and has been administered without regard to race. Id. Accordingly, the court concluded that existing racial imbalances were not traceable to prior de jure segregation.

As to the fourth area of imbalance -- the District's staff -- the district court found that based on the limited evidence presented regarding the race of the

_____

[3]The district court's table included no data for the school year 1976-1977 or 1977-1978.

15

District's elementary school principals and assistant principals,[4] "any minimal imbalance that presently exists" was not proximately traceable to prior de jure segregation or the result of intentional discrimination. Id. at 1361. The 1970 desegregation plan, the district court found, "effectively desegregated the District's staff" by assigning principals in a manner that ensured all students would attend at least one school with a white principal and at least two schools with a black principal. Id.

As to the fifth imbalanced area -- the District's gifted program for high-performing students -- the district court observed black students were "arguably" underrepresented in the program. Id. at 1362.[5] However, the court found that placement in the gifted program was governed by statewide eligibility requirements,[6] that no student had been admitted to the program without satisfying

_____

[4]The most recent data presented apparently showed only that during the 1994-1995 school year, the District's K-5 schools Jerger, Harper, and Scott all had white principals; MacIntyre Park had a black principal and a white assistant principal; and Thomasville High had a white principal and an assistant principal described by the district court as "BW," with "B" signifying black and "W" signifying white.

[5]The district court did not lay out all of the relevant data in its opinion, but observed that the Plaintiffs' "statistical analysis of the students participating in the program arguably reveals a disproportionate number of whites in the Gifted Program compared to their overall representation in the school population." Thomas County NAACP, 299 F. Supp. 2d at 1362.

[6]Georgia Department of Education regulations provide that a student is eligible for participation in the Gifted Program if he or she:

(a) score[s] at the 99th percentile (for grades K-2) or the 96th percentile (for grades 3-12) on the composite of full scale score of a standardized test of mental

16

these requirements, and that no student satisfying the requirements had ever been denied the opportunity to participate on the basis of race or otherwise. Accordingly, the court concluded that racial imbalances in the District's gifted program were not proximately traceable to the District's prior de jure segregation, nor were they the result of present intentional discrimination.

Regarding the sixth area of imbalance -- the district's special education program -- the district court again found that black students were "arguably" overrepresented.[7] Id. The program, the district court observed, was governed by myriad state and federal regulations -- including rules issued by the Georgia Department of Education and procedures outlined in the Individuals with Disabilities Act, 20 U.S.C. § 1400 et seq. -- with which the District reasonably complied. Specifically, the court found no evidence that any student had been placed in special education unless state and federal requirements were satisfied, and no evidence that race had ever been a factor in a placement decision.

> ability and meet[s] one of the achievement criteria [described in the regulations], or (b) qualif[ies] through a multiple-criteria assessment process by meeting the criteria in any three of the following four areas: mental ability (intelligence), achievement, creativity and motivation.

Thomas County NAACP, 299 F. Supp. 2d at 1362 n.27 (alterations in original) (quoting Ga. Dep't of Educ. Reg. 160-4-2-.38).

[7]The district court did not lay out the data with particularity in its opinion, but explained that "Plaintiffs presented evidence that arguably showed a disproportionate number of black students are included in the Special Education Program." Thomas County NAACP, 299 F. Supp. 2d at 1362.

Accordingly, the court concluded that any racial imbalance was not proximately traceable to de jure segregation.

As to the final imbalanced area -- administration of discipline -- the district court assumed without deciding that black students were disproportionately subjected to disciplinary action, concluding nevertheless that the District did not treat black students differently from white students in disciplining them. The court found no evidence that a black student had ever received a harsher punishment than a white student for similar misconduct or that a black student had ever received a referral for punishment where a white student did not under the same or similar circumstances. The district court found that race had not been a factor in any disciplinary decision, and that any racial imbalance in the administration of discipline was not proximately traceable to past de jure segregation.

In addition, the district court examined several other facets of the Thomasville school system where it found no racial imbalances present: the District's facilities, transportation services, and extracurricular activities. As to facilities, the court found no disparity in the facility quality or resources of the District's identifiably black schools as compared to its identifiably white school, and concluded that race played no role in the District's allocation of funds to the various schools. Regarding transportation, the district court observed that the only

18

transportation the District offered was for special education and extracurricular activities, as well as a very limited route implemented after the closing of Douglass Elementary to transport students previously enrolled there to Harper Elementary. The court concluded that because Douglass' student body had been 100% black, only black students received transportation, and thus the District did not discriminate against black students in the provision of transportation. Regarding extracurricular activities, the court found that all of the District's extracurriculars were available to all students without regard to race, and that no racial imbalances existed within those programs.

Based on these findings, the district court ruled in favor of the District, concluding that although racial imbalances existed in some aspects of the District's schools, they were neither traceable to the District's prior de jure segregation, nor the result of present intentional discrimination. The district court's judgment, dated February 6, 2004, directed that each side would bear its own costs.

## II.

The Plaintiffs raise five broad issues on appeal. First, they argue that the district court's failure to determine whether the District had achieved "unitary status" constitutes reversible error. Second, the Plaintiffs claim that the district court misapplied the so-called "Keyes" presumption that present racial imbalances

19

within a previously <u>de jure</u> segregated school system are a result of prior segregation, because the burden of proof it placed on the District to rebut the presumption was too low in several respects. Third, the Plaintiffs say that the district court failed to scrutinize with sufficient rigor the District's use of "ability tracking" to assign students to classes. Fourth, the Plaintiffs contend that the district court failed to articulate or apply any standard for intentional discrimination. Finally, Plaintiffs suggest that the district court's legal errors infected its factual findings, and that the court made several findings of fact that were clearly erroneous.

In school desegregation cases, we review <u>de novo</u> the district court's interpretation and application of the law. <u>N.A.A.C.P., Jacksonville Branch v. Duval County Sch.</u>, 273 F.3d 960, 965 (11th Cir. 2001) ("<u>Jacksonville NAACP</u>"); <u>Manning</u>, 244 F.3d at 940. However, insofar as the Plaintiffs ask us to review the district court's factual findings, we do so only for clear error. Fed. R. Civ. P. 52(a); <u>Jacksonville NAACP</u>, 273 F.3d at 965; <u>Manning ex rel. Manning v. Sch. Bd.</u>, 244 F.3d 927, 940 (11th Cir. 2001).

A.

We begin with a brief overview of the applicable law of school desegregation. The Supreme Court's decisions in <u>Brown v. Board of Education</u>,

20

347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954) ("Brown I"), and Brown v. Board of Education, 349 U.S. 294, 75 S. Ct. 753, 99 L. Ed. 1083 (1955) ("Brown II"), placed all de jure segregated school systems under a constitutional obligation to desegregate. See, e.g., Green v. County Sch. Bd., 391 U.S. 430, 435-36, 88 S. Ct. 1689, 20 L. Ed. 2d 716 (1968) ("[S]chool boards operating [dual] school systems were required by Brown II 'to effectuate a transition to a racially nondiscriminatory school system.' . . . Brown II was a call for the dismantling of well-entrenched dual systems . . . ."). The Supreme Court has explained this affirmative obligation in these terms: "The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional de jure system. This is required in order to ensure that the principal wrong of the de jure system, the injuries and stigma inflicted upon the race disfavored by the violation, is no longer present." Freeman v. Pitts, 503 U.S. 467, 485, 112 S. Ct. 1430, 118 L. Ed. 2d 108 (1992); see also, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971) (explaining that formerly dual school systems are "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch" (quoting Green, 391 U.S. at 437-38)).

A school district's obligation is to eliminate the vestiges of past

discrimination "to the extent practicable." Manning, 244 F.3d at 943 (quoting

Lockett v. Bd. of Educ., 111 F.3d 839, 842 (11th Cir. 1997)). However, our Court

and the Supreme Court have both explicitly rejected the notion that school systems

must eliminate vestiges of discrimination "to the maximum extent practicable."

See, e.g., Missouri v. Jenkins, 515 U.S. 70, 101, 115 S. Ct. 2038, 132 L. Ed. 2d 63

(1995) (explaining that the proper judicial inquiry is whether the district has

remedied vestiges of de jure segregation "to the extent practicable," not to the

"maximum potential"); Manning, 244 F.3d at 943.

Judicial authority may be invoked when a school district fails to fulfill this

duty: "If school authorities fail in their affirmative obligations under [Brown I,

Brown II, and Green], judicial authority may be invoked. Once a right and a

violation have been shown, the scope of a district court's equitable powers to

remedy past wrongs is broad, for breadth and flexibility are inherent in equitable

remedies." Swann, 402 U.S. at 15. However, "[i]n seeking to define . . . how far

this remedial power extends it is important to remember that judicial powers may

be exercised only on the basis of a constitutional violation. Remedial judicial

authority does not put judges automatically in the shoes of school authorities

whose powers are plenary. Judicial authority enters only when local authority

22

defaults." Id. at 16. Accordingly, in deciding whether judicial supervision may properly be imposed in this case, the key consideration is whether the District has met its obligation to eliminate the vestiges of its dual school system "to the extent practicable."

In determining whether past discrimination has been sufficiently eradicated, the Supreme Court has advised, courts must examine a number of specific facets of a school system: its faculty, staff, transportation, extracurricular activities, and facilities. Green, 391 U.S. at 435. These areas, "in addition to student attendance patterns, must be free from racial discrimination before the mandate of Brown is met." Freeman, 503 U.S. at 486. These so-called "Green factors," the Court has explained, "are a measure of the racial identifiability of schools in a system that is not in compliance with Brown . . . ." Id.

In determining whether the school district has eliminated vestiges of de jure segregation to the extent practicable in those six areas, "a critical beginning point is the degree of racial imbalance in the school district, that is to say a comparison of the proportion of majority to minority students in individual schools with the proportions of the races in the district as a whole." Id. at 474. In historically segregated school systems, the Supreme Court has held, "where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial

23

composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a prima facie case of violation of substantive constitutional rights under the Equal Protection clause is shown." Swann, 402 U.S. at 18.

The burden then shifts to the school district to demonstrate that the racial imbalances are "not the result of present or past discriminatory action on their part." Id. at 26; accord Freeman, 503 U.S. at 494 (holding that in a formerly de jure segregated school system, "[t]he school district bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation"); Jacksonville NAACP, 273 F.3d at 966; Manning, 244 F.3d at 942.[8]

One way for the school district to meet its burden is by showing that the racial imbalances are attributable to demographic forces. The Supreme Court has

_____

[8]The district court and the parties refer to the burden-shifting framework explicated in Swann and Freeman as the "Keyes presumption," drawing on the Supreme Court's opinion in Keyes v. School District No. 1, 413 U.S. 189, 93 S. Ct. 2686, 37 L. Ed. 2d 548 (1973). Our previous cases, too, have repeatedly attributed this methodology to Keyes. See, e.g., Manning, 244 F.3d at 942; Jacksonville NAACP, 273 F.3d at 966; Lee v. Etowah County Bd. of Educ., 963 F.3d 1416, 1425 (11th Cir. 1992). However, as the above discussion illustrates, what we have called the "Keyes" presumption is actually rooted in Swann and Freeman. Keyes, in contrast, addressed segregation in a school district that was never statutorily dual. The Supreme Court held that a finding of systematic segregation in certain schools within a unified school district creates a presumption that the remaining schools within the district were also systematically segregated, absent a showing that the district was divided into clearly unrelated units. Keyes, 413 U.S. at 207. Since Thomasville operated a school system that was formally dual in its entirety, Swann and Freeman are more closely on point than Keyes. Nevertheless, for simplicity's sake, we adhere to our Court's imprecise but long-established terminology and call the burden-shifting framework applicable here the "Keyes presumption."

24

explained that "[a]s the de jure violation becomes more remote in time and . . . demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior de jure system." Freeman, 503 U.S. at 496. Accordingly, "[o]nce the racial imbalance due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors." Id. at 494; accord Swann, 402 U.S. at 31-32 ("Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system. This does not mean that federal courts are without power to deal with future problems; but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary.").

If the school district can demonstrate that demographic factors are "a substantial cause" of the racial imbalances in its schools, "it overcomes the presumption that segregative intent is the cause, and there is no constitutional violation." Jacksonville NAACP, 273 F.3d at 966; accord Manning, 244 F.3d at

25

944. The school district need not prove that demographics are the sole cause of the imbalances. As we have explained previously, "a plaintiff does not undermine the strength of a defendant's demographic evidence by merely asserting that demographics alone do not explain the racial imbalances. Rather, for a plaintiff to preserve the presumption of de jure segregation, the plaintiff must show that the demographic shifts are the result of the prior de jure segregation or some other discriminatory conduct." Id. at 944-45 (footnote omitted).

B.

With this legal framework in mind, we turn now to each of the arguments the Plaintiffs have raised on appeal.

1.

The Plaintiffs' first claim is that the district court erred in failing to determine whether the District had achieved "unitary status." Indeed, the district court explicitly declined to make such a determination, explaining: "To avoid confusing terminology, the Court has refrained from using the terms 'unitary' or 'unitary status' in describing its findings and conclusions in this case." Thomas County NAACP, 299 F. Supp. 2d at 1366 n. 30.

However, the district court's decision not to make such a finding was not error, for two reasons. First, an assessment of unitary status is generally only made

26

when a district court is deciding "when it is appropriate to restore local control" (i.e., to end judicial supervision) of a school system. See Manning, 244 F.3d at 942. This much is evident from the two factors courts consider in making the unitariness determination: (1) "whether local authorities have eliminated the vestiges of past discrimination to the extent practicable," and (2) "whether local authorities have in good faith fully and satisfactorily complied with, and shown a commitment to, the desegregation plan." Id. In a case such as this one -- where the school district has never been placed under judicial supervision -- the second prong of the inquiry has no application, since no desegregation plan has ever been imposed on the district.

Second, and more important, the Supreme Court and this Court have made clear that the substance of the judicial inquiry, not the terminology employed, is what matters. The usefulness of the terms "unitary" and "unitary status" has been called into question, and in fact the Supreme Court has urged the lower courts to discard these terms, explaining:

> The lower courts have been inconsistent in their use of the term "unitary." Some have used it to identify a school district that has completely remedied all vestiges of past discrimination. Under that interpretation of the word, a unitary school district is one that has met the mandate of [Brown and Green]. Other courts, however, have used "unitary" to describe any school district that has currently desegregated school assignments, whether or not that status is solely the result of a court-imposed desegregation plan. In other words, such

27

a school district could be called unitary and nevertheless still contain vestiges of past discrimination. That there is such confusion is evident in Georgia State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403 (CA11 1985), where the Court of Appeals drew a distinction between a "unitary school district" and a district that has achieved "unitary status."

Bd. of Educ. v. Dowell, 498 U.S. 237, 245, 111 S. Ct. 630, 112 L. Ed. 2d 715 (1991) (citations omitted).

Accordingly, the Supreme Court explained that "it is a mistake to treat words such as 'dual' and 'unitary' as if they were actually found in the Constitution. The constitutional command of the Fourteenth Amendment is that '[n]o State shall . . . deny to any person . . . the equal protection of the laws.'" Id. at 245-46; see also Freeman, 503 U.S. at 487. This obligation, not whether a school district may be labeled "unitary," is the proper focus of judicial inquiry.

In Lee v. Etowah County Board of Education, 963 F.2d 1416 (11th Cir. 1992), we similarly observed that "[m]uch confusion has arisen from the use of the terms 'unitary' and 'unitary status.'" Id. at 1419 n.3. We therefore declared: "To minimize confusion, we discourage the future use of the term 'unitary' to describe a system that has not eliminated vestiges of past discrimination to the extent practicable but is merely currently in compliance with a court-imposed desegregation plan . . . ." Id. Thus, when the plaintiffs in Lee "complain[ed] that the district court should have used the phrase 'unitary status' rather than the phrase

28

'unitary system,'" the Court stated: "The district court's opinion makes clear that it found that the defendants had eliminated the vestiges of their prior discrimination; thus, it is wholly irrelevant what precise language the district court used to announce its findings." Id. at 1424 n.9.

Mindful of the Supreme Court's direction that "[s]ubstance, not semantics, must govern" in remedying school segregation, Swann, 402 U.S. at 31, we hold that the district court committed no error by declining to make a finding of "unitary status."

2.

The Plaintiffs' second argument on appeal is that the district court misapplied the so-called "Keyes" presumption that present racial imbalances within a previously de jure segregated school system are proximately traceable to prior segregation, by placing too low a burden of proof on the District to rebut the presumption. Specifically, the Plaintiffs argue that the district court erred in three ways: it failed to hold the District to its obligation to eliminate the vestiges of segregation to the extent practicable; it failed to require the District to show that its own policies were not factors contributing to its racial imbalances; and it failed to require the District to show that demographic changes were the "substantial" cause of the racial imbalances.

29

As to the first argument, the Plaintiffs suggest that the district court erroneously failed to require the District to present evidence that it had eliminated the vestiges of segregation to the extent practicable -- that is, that the District had taken "every reasonable effort . . . to eradicate segregation and its insidious residue." Appellants' Br. at 23 (quoting Jacksonville, 273 F.3d at 973). Essentially, the Plaintiffs' argument is that the district court failed to consider the substance of the unitariness analysis. The Plaintiffs are correct that the essence of a school district's desegregation duty is to eliminate the vestiges of segregation "to the extent practicable," and that the district court neglected to use this precise terminology in assessing whether the District had fulfilled its obligation. Nevertheless, we can find no reversible error here, since the district court's thorough opinion and detailed findings plainly illustrate that the court got the substance of the inquiry right.

A district court may impose court supervision of a school district's desegregation efforts "only insofar as it advances the ultimate objective of alleviating the initial constitutional violation." Freeman, 503 U.S. at 489. Accordingly, in considering whether to place a school district under judicial supervision, the proper focus of a district court's inquiry is on whether a constitutional violation exists -- that is, whether the district has failed to meet its

30

constitutional obligation to desegregate its schools to the extent practicable.  See, e.g., Swann, 402 U.S. at 16.

We have instructed the district courts that, in evaluating whether a school district has "[met] its constitutional obligation to eliminate the vestiges of de jure segregation to the extent practicable," a court must examine the six areas of the school system enumerated in Green, applying the "presumption that any current racial disparities in these areas are the result of [the district's] past unlawful conduct."  Jacksonville NAACP, 273 F.3d at 966.  The school district "bears the burden of showing that any current imbalance [in these areas] is not traceable, in a proximate way, to the prior violation."  Id. (alteration in original) (quoting Freeman, 503 U.S. at 493).

Our case law establishes that if the school district proves that demographic shifts have substantially caused any current racial imbalances in the school system, it will have satisfied its constitutional obligation to eliminate the vestiges of segregation to the extent practicable: "If a school board can prove that [demographic or other external] factors have substantially caused current racial imbalances in its schools, it overcomes the presumption that segregative intent is the cause [of any racial imbalance], and there is no constitutional violation.  Where there is no constitutional violation, a school board is under no duty to remedy

31

racial imbalances."  Id.

Here, the district court repeatedly emphasized that the District was constitutionally obligated to desegregate its schools, see, e.g., Thomas County NAACP, 299 F. Supp. 2d at 1343-51, 1366, but did not explicitly acknowledge that the nature of the obligation was to eliminate the vestiges of segregation "to the extent practicable"; accordingly, the district court never explicitly determined whether the District had satisfied this obligation.  In spite of its failure to use the most precise words, the district court got the substance of the inquiry right.

Heeding the Supreme Court's directive that judicial authority may not be invoked unless local authority has defaulted on its obligation to remedy a constitutional violation, see Swann, 402 U.S. at 16, the district court focused its inquiry on whether any unremedied constitutional violation lingered in the Thomasville school district.  Since the District had previously operated a de jure segregated school system, the district court observed first that the proper consideration was "whether any vestiges of the previous de jure system still exist." Thomas County NAACP, 299 F. Supp. 2d at 1366.  To make this determination, the district court evaluated at some length each of the Green factors (which, again, include student assignments, facilities, faculty and staff assignments, transportation, and extracurricular activities), as well as the District's curriculum

32

and class assignments, gifted and special education programs, and discipline system, to determine whether racial imbalances were present in any of these areas. See id. at 1352 & n.14. Invoking the so-called Keyes presumption, the district court observed that any such imbalances must be "presumed to be vestiges of the previous de jure segregated system." Id. at 1352.

Identifying racial imbalances in a number of the Green and other areas (elementary school student population; individual classes; faculty assignments; staff assignment; gifted and special education programs; and disciplinary actions), the court went on to "examine[] each of these areas to determine whether the District has carried its burden of proof by proving by a preponderance of the evidence that these racial imbalances are not traceable in a proximate way to the District's previous de jure segregated system." Id. at 1354; see also id. at 1366. For each imbalanced area, the district court unambiguously found that demographic and other external factors -- including "changes in the racial makeup of the City of Thomasville, shifting housing patterns, and changes in the enrollment of the District's schools caused by declining white enrollment as compared to black enrollment" -- were the cause of the imbalance. Id. at 1358.

Upon determining that the District had carried its burden in a particular area, the trial court then asked "whether the District presently engages in purposeful

racial discrimination" in that area. Id. at 1366. The district court found each area of the Thomasville school system to be free of intentional racial discrimination.

Finally, the district court concluded that "the District carried its burden of proving that the racial imbalances in [certain] areas were not traceable in a proximate way to its previous de jure segregated system," and that "current purposeful discrimination did not proximately cause these imbalances." Id. at 1367. "[S]ince these imbalances are not vestiges of the previous de jure segregated system and are not the proximate result of presently practiced racial discrimination, they do not support a claim under either the Fourteenth Amendment or Title VI." Id.; see also id. at 1352.

In substance, the district court's analysis tracked precisely the methodology prescribed by the Supreme Court and this Court for determining whether a school district has fulfilled its constitutional obligation to desegregate. In concluding that racial imbalances within the Thomasville school system were traceable not to any historical segregation but rather to demographic and other external forces, the district court necessarily found that the District had eliminated the vestiges of segregation "to the extent practicable." Quite simply, the district court's failure to employ the term "to the extent practicable" does not amount to reversible error.

Next, the Plaintiffs suggest that the District's burden of rebutting the

34

presumption of continuing segregation required it to demonstrate that "its policies and practices with respect to schoolsite location, school size, school renovations and additions, student-attendance zones, student assignment and transfer options, mobile classroom units, transportation of students, assignment of faculty and staff, etc., considered together . . . were not factors in causing the existing condition of segregation in these schools." Appellants' Br. at 28 (quoting Keyes, 413 U.S. at 213-14).

The Plaintiffs have taken this standard out of context. For one thing, it derives from Keyes, which, as we noted earlier, dealt with a school system that was not statutorily segregated. The standard the Plaintiffs quote lays out the burden a school district faces in rebutting the presumption that an entire unified school system is infected with intentional segregation, which arises out of a finding of intentional segregation in a single school within that system. See Keyes, 413 U.S. at 213-14. The presumption is not applicable here, since Thomasville operated a school system that was concededly segregated in its entirety under Georgia law.

Second, even if that presumption was applicable in this case, the Plaintiffs, we think, have omitted with an ellipsis a crucial aspect of the standard. The district's burden is to prove that its policies and practices "either were not taken in effectuation of a policy to create or maintain segregation in the core city schools,

35

or, if unsuccessful in that effort, were not factors in causing the existing condition of segregation in these schools." Id. at 214 (emphasis added). All the former component requires the school district to prove is that its policies and practices were not intentionally discriminatory. Only if the school district is unable to do so is it required to demonstrate that its policies "were not factors" in creating segregated conditions. In this case, the district court concluded that the District's policies and practices were not intentionally discriminatory, and therefore the court had no occasion to consider whether these policies were "factors" contributing to racial imbalances in Thomasville schools.

Third, our Court and the Supreme Court have repeatedly defined the burden that a formerly de jure segregated school district must carry not as the Keyes-derived standard Plaintiffs favor, but rather the standard employed by the district court: "The school district bears the burden of showing that any current [racial] imbalance is not traceable, in a proximate way, to the prior violation." Freeman, 503 U.S. at 494; accord, e.g., Manning, 244 F.3d at 942; Jacksonville NAACP, 273 F.3d at 966.

The district court's opinion illustrates that this was exactly the burden to which it held the District. See, e.g., Thomas County NAACP, 299 F. Supp. 2d at 1352 ("The Court . . . finds that any racial imbalances that presently exist within

36

the District are not traceable in a proximate way to the <u>de jure</u> racially segregated system that existed at the time <u>Brown I</u> was decided almost fifty years ago.  The Court does find that racial imbalances presently exist within the District in certain areas.  Under <u>Keyes</u> these racial imbalances are presumed to be vestiges of the previous <u>de jure</u> segregated system.  However, as set forth hereinbelow, the Court finds that the District carried its burden of proof by rebutting that presumption."); <u>id.</u> at 1366 ("For those areas in which the Court has found current racial imbalances, there is a presumption that those racial imbalances are vestiges of the District's previous <u>de jure</u> segregated system, and Defendant bears the burden of rebutting that presumption by proving by a preponderance of the evidence that the racial imbalances are not traceable in a proximate way to the previous <u>de jure</u> segregated system.").[9]

The district court therefore held the City of Thomasville School District to the appropriate burden, and committed no error in declining to place on the District the burden of demonstrating that its policies and practices were not factors

_____

[9]The district court also explicitly acknowledged the <u>Keyes</u> standard advanced by the Plaintiffs, accurately explaining that <u>Keyes</u> held "that if a school board has intentionally engaged in segregative actions in a meaningful portion of its system, then a presumption is created that any segregation within the system is the result of that intentional segregation.  The burden then shifts to the school board 'to disprove segregative intent . . . [or show] that its past segregative acts did not create or contribute to the current segregated condition of the [school system].'" <u>Thomas County NAACP</u>, 299 F. Supp. 2d at 1350-51 (alterations in original) (emphasis added) (citation omitted) (quoting <u>Keyes</u>, 413 U.S. at 211).

37

contributing to the racial imbalances within its schools.

Finally, the Plaintiffs argue that the district court erred by failing to require the District to show that demographics were the "substantial" cause of the racial imbalances in its student population. The Plaintiffs concede that a school district may overcome the presumption that racial imbalances are attributable to past <u>de jure</u> segregation by demonstrating that they were instead caused by demographic shifts, but they maintain that the District's showing in this case was inadequate, since the district court did not find that demographics constituted a <u>substantial</u> cause of those imbalances. Because the district court's careful analysis reveals that it unambiguously <u>did</u> find demographics to be the substantial cause of the racial imbalances in the student populations of certain Thomasville elementary schools, we can discern no error.

We have repeatedly observed that one way for a school district to rebut the presumption that racial imbalances are attributable to past segregation is to "prove that [demographic shifts or other external forces] have substantially caused current racial imbalances in its schools." <u>Jacksonville NAACP</u>, 273 F.3d at 966. Indeed, the Supreme Court has explained that efforts to counteract the effects of demographic shifts are simply beyond the scope of judicial authority:

> The effect of changing residential patterns on the racial composition
> of schools, though not always fortunate, is somewhat predictable.

38

Studies show a high correlation between residential segregation and school segregation. . . . Where resegregation is a product not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal courts to try to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the courts of school districts simply because they were once de jure segregated. Residential housing choices, and their attendant effects on the racial composition of schools, present an ever-changing pattern, one difficult to address through judicial remedies.

Freeman, 503 U.S. at 495.

After discussing at considerable length the Supreme Court's precedents to this effect, see Thomas County NAACP, 299 F. Supp. 2d at 1349-50, the district court conducted a detailed analysis of the effect of demographic shifts on the student populations of Thomasville's elementary schools. Laying out the pertinent data in table form, the district court explained that for the first six years after the District adopted its 1970 desegregation plan, the racial composition of each of the District's schools "closely tracked" the racial composition of the District as a whole. Id. at 1355.

Nevertheless, the district court explained: "After the Desegregation Plan was implemented, the number of white students enrolled in the District declined substantially over a period of several years. Meanwhile, black enrollment remained fairly stable." Id. at 1356 (citations omitted). The court supplied data for

the eight-year period from 1970-1978 illustrating this change in the racial composition of the District's student body:

| School Year | White | Black | Total | % Black |
|---|---|---|---|---|
| 1970-1971 | 2274 | 2438 | 4712 | 51.74% |
| 1971-1972 | 2018 | 2554 | 4572 | 55.86% |
| 1972-1973 | 1888 | 2598 | 4486 | 57.91% |
| 1973-1974 | 1614 | 2604 | 4218 | 61.74% |
| 1974-1975 | 1492 | 2595 | 4087 | 63.49% |
| 1975-1976 | 1468 | 2499 | 3967 | 62.99% |
| 1976-1977 | 1459 | 2487 | 3946 | 63.03% |
| 1977-1978 | 1311 | 2520 | 3831 | 65.78% |

Then, the district court explained: "In addition to changes in school enrollment, the City of Thomasville also experienced population shifts after the implementation of the Desegregation Plan. In 1970, the black population in the City was concentrated primarily in the City's southwestern sector. Since that time, the distribution of the black population throughout Thomasville has changed." Id. (citations omitted).

As an example, the court explained that "in 1970, Harper Elementary School was surrounded by some predominantly white communities. As the neighborhoods around Harper became increasingly black, so did Harper's student population. Because of the changes in the black population of the District and the City of

40

Thomasville, demographics overtook the Desegregation Plan and Harper's enrollment became increasingly black." Id. (citations omitted). Indeed, "Harper's variance from the district-wide percentage of black students went from approximately 6% in 1970 to almost 20% in 1975, while the other elementary schools' black enrollment during that period varied no more than 11% from the district-wide black enrollment for the elementary grades." Id. In addition, the district court noted, "[b]y 1980 the area around Harper had become almost entirely black and by 1990 there were few, if any, white students left in the area." Id. at 1356 n.19.

Based on this analysis, the district court concluded that demographic changes, not prior de jure segregation or present intentional discrimination, were responsible for the racial imbalances in the District's elementary school populations:

> Based upon the evidence presented at trial, the Court finds that the racial composition of the District's elementary schools is currently "imbalanced" because of changes in the racial makeup of the City of Thomasville, shifting housing patterns, and changes in the enrollment of the District's schools caused by declining white enrollment as compared to black enrollment. The Court finds that the current racial imbalances of the District's elementary schools are not due to any intentional discrimination on the part of the District and are not vestiges of the District's previous de jure racially segregated system.

Id. at 1358.

41

Although the district court did not explicitly say that demographic changes were the "substantial" cause of the racial imbalances, it clearly found that the imbalances existed "because of" such changes, and that they were "not due to" any current intentional discrimination or past de jure segregation. The court's findings therefore unmistakably indicate that it found demographic shifts to be the substantial cause of the racial imbalances in Thomasville schools.

Insofar as the Plaintiffs are saying that the district court did not find demographics to be the sole cause of these imbalances, this simply is not the burden that the District bears. As we observed earlier, "a plaintiff does not undermine the strength of a defendant's demographic evidence by merely asserting that demographics alone do not explain the racial imbalances. Rather, for a plaintiff to preserve the presumption of de jure segregation, the plaintiff must show that the demographic shifts are the result of the prior de jure segregation or some other discriminatory conduct." Manning, 244 F.3d at 944-45 (footnote omitted). The Plaintiffs in this case have made no such showing, and thus the district court committed no error in concluding that the District had carried its burden by demonstrating that demographic changes, not past segregation or present intentional discrimination, were responsible for the racial imbalances in the student bodies of District schools.

3.

The Plaintiffs' third argument on appeal is that in analyzing the constitutionality of the District's "ability-grouping" or "tracking" practices, the district court failed to apply this Circuit's precedent, which permits tracking only when it "is not based on the present results of past segregation or will remedy such results through better educational opportunities." Ga. State Conference of Branches of NAACP v. Georgia, 775 F.2d 1403, 1414 (11th Cir. 1985) ("Ga. NAACP"). On this point, we agree with the Plaintiffs that the district court failed to apply the Circuit's well-settled standard, and that this constitutes reversible error.

Although ability-grouping practices may have the effect of creating racial imbalances within classrooms, we have "consistently stated that ability grouping is not per se unconstitutional." Castaneda v. Pickard, 648 F.2d 989, 994 (5th Cir. June 23, 1981).[10] As the Plaintiffs have observed, such practices are permissible in spite of any segregative effect they may have if the assignment method "is not based on the present results of past segregation or will remedy such results through better educational opportunities." McNeal v. Tate County Sch. Dist., 508 F.2d

---

[10]The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

43

1017, 1020 (5th Cir. 1975); see also, e.g., Ga. NAACP, 775 F.2d at 1414; Quarles

v. Oxford Mun. Separate Sch. Dist., 868 F.2d 750, 753-54 (5th Cir. 1989).

In this case, the district court found that the District's use of ability-grouping

created racial imbalances within many of the district's individual classes.

Specifically, the court found overrepresentation of black students in less

academically advanced classes and overrepresentation of white students in more

academically advanced classes. These imbalances, the court concluded, were "a

result of the District's educational policy of 'ability grouping' or 'tracking.'"

Thomas County NAACP, 299 F. Supp. 2d at 1358.

However, the district court did not ask whether the District's ability-

grouping practices satisfied our long-established requirement that the tracking

policy either not be based on present results of past discrimination or be designed

to remedy such results. Instead of determining whether the District's ability-

grouping policy was based on present results of past segregation or whether it

would remedy such results, the district court focused on whether the tracking

practice was intentionally discriminatory. The court acknowledged that "the

District's tracking system has had the effect of creating racially imbalanced classes

within the District's schools," but determined that "it was not the intention of the

tracking system to segregate students based upon race" and that "the District does

44

not manipulate the ability tracking system in order to track students based upon their race." Id. at 1359. To pass any further judgment on the District's tracking policy, the court determined, was "beyond the realm of expertise of the judicial branch," and best left to educators. Id. at 1358 n.22.

However, whether a school district's ability-grouping practices are based on present results of past discrimination, and whether they will remedy such results, are well-settled subjects of judicial inquiry, since they go to the constitutionality -- not the soundness as a policy matter -- of these practices. See, e.g., McNeal, 508 F.2d at 1020; Ga. NAACP, 775 F.2d at 1414; Castaneda, 648 F.2d at 996-97 ("The merits of a program which places students in classrooms with others perceived to have similar abilities are hotly debated by educators; nevertheless, it is educators, rather than courts, who are in a better position ultimately to resolve the question whether such a practice is, on the whole, more beneficial than detrimental to the students involved. Thus, as a general rule, school systems are free to employ ability grouping, even when such a policy has a segregative effect, so long, of course, as such a practice is genuinely motivated by educational concerns and not discriminatory motives." (emphasis added)).

The district court's failure to conduct the proper inquiry requires us to remand this issue for the district court to reconsider the constitutionality of the

District's ability-grouping practices, applying the legal framework established by our Circuit's precedents in McNeal and Georgia NAACP. Because "[p]roper resolution of any desegregation case turns on a careful assessment of its facts," Freeman, 503 U.S. at 474, we will not decide for ourselves whether the District's use of tracking passes muster under this standard, but rather afford the trier of fact the first opportunity to do so.

4.

The Plaintiffs' fourth claim on appeal is that the district court failed to articulate any standard for determining whether the District engaged in present intentional discrimination, and that the court should have asked whether race was a substantial motivating factor in the District's actions. Appellants' Br. at 35 (citing Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265-66, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)). We agree with the Plaintiffs that the district court could have been clearer in explicating the standard it applied, but the court's thorough and thoughtful opinion leaves us convinced that it understood and correctly applied the law.

The Plaintiffs in this case argued to the district court primarily that racial imbalances in various facets of the District's school system were traceable to the District's prior de jure segregation, and therefore violated the Plaintiffs' Fourteenth

46

Amendment equal protection rights. However, in the alternative, the Plaintiffs claimed that the District presently practices intentional discrimination, unrelated to its history of de jure segregation, in violation of the equal protection principles. Acknowledging both of these lines of argument, the district court explained:

> To establish such a constitutional violation, the evidence must be sufficient to support a finding that Defendant has engaged in intentional discrimination based upon race. See, e.g., Washington v. Davis, 426 U.S. 229, 238-42 (1976); Keyes, 413 U.S. at 205. . . . Therefore, the Court's first inquiry is whether Defendant operates an intentionally segregated school system based upon race or has otherwise engaged in purposeful racial discrimination. When a school district has previously operated a de jure segregated system, a district court must first determine whether any vestiges of the previous de jure system still exist before turning to whether the school district presently engages in racial discrimination unrelated to the previous de jure segregated system.

Thomas County NAACP, 299 F. Supp. 2d at 1365-66.

The district court went on to observe that if, after applying the Keyes presumption, it found that racial imbalances in the District were not traceable to prior segregation, "then the Court must determine whether they are the result of current, intentional racial discrimination." Id. at 1366. And even for areas in which the district court found no racial imbalances, "the Court must ascertain whether the District presently engages in purposeful racial discrimination in violation of the Fourteenth Amendment and Title VI." Id.

The district court's explanation of the law echoes the essence of the Supreme

47

Court's holding in Arlington Heights -- the case the Plaintiffs argue the district court failed to apply -- which is that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Arlington Heights, 429 U.S. at 265. Indeed, it is well established that proving intent to discriminate is the essential element of an equal protection claim. See, e.g., Washington v. Davis, 426 U.S. 229, 240, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976); Hernandez v. New York, 500 U.S. 352, 359-60, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991) ("A court addressing [an equal protection claim] must keep in mind the fundamental principle that 'official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.'" (omission in original) (quoting Arlington Heights, 429 U.S. at 264-265)); Johnson v. Bush, 2005 WL 832217 (11th Cir. April 12, 2005); Citizens Concerned About Our Children v. School Bd.,193 F.3d 1285, 1294 (11th Cir. 1999); Ellston v. Talladega County Bd. of Educ., 997 F.2d 1394, 1406 (11th Cir. 1993); Mencer v. Hammonds, 134 F.3d 1066, 1070 (1998); Parks v. City of Warner Robins, 43 F.3d 609, 616 (11th Cir. 1995).

In order to establish a present intent to discriminate, the burden rests with the Plaintiffs to demonstrate that the District acted with discriminatory purpose.

48

See, e.g., Cooper v. Southern Co., 390 F.3d 695, 723 (2004); Ellston, 997 F.2d at 1406. The Supreme Court has explained that "'[d]iscriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Hernandez, 500 U.S. at 360 (quoting Pers. Adm'r v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979)) (omissions in original); accord, e.g., In re Employment Discrimination Litigation Against State of Ala., 198 F.3d 1305, 1321 (11th Cir. 1999). "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266.

The district court conducted precisely this sort of sensitive inquiry, focusing on whether the evidence established that the District, in any area of its operations, acted "because of" race. Thus, for example, as to the racial composition of the District's elementary schools, the court found that imbalances existed "because of changes in the racial makeup of the City of Thomasville, shifting housing patterns, and changes in the enrollment of the District's schools caused by declining white enrollment as compared to black enrollment," and, notably, that the imbalances

were "not due to any intentional discrimination on the part of the District."

Thomas County NAACP, 299 F. Supp. 2d at 1358. Similarly, the district court plainly found that "any racial imbalances that presently exist regarding the District's faculty are not traceable . . . to current racial discrimination," since "the District's faculty assignment system from 1983 to the present has not been administered in a racially discriminatory manner and that the system is presently administered without regard to race." Id. at 1360-61.

Nor, the district court found, was race a motivating factor in any other area of the District's operations. Thus, as to the District's program for high-performing students, the district court concluded "that no student has ever been denied an opportunity to participate in the Gifted Program because of race." Id. at 1362. Likewise, regarding special education, the district court determined "that race has not been a factor in any decision made by the District regarding placement of children in the Special Education Program." Id. at 1363. As to disciplinary actions, the court found "that race has not been a factor in any decision made by the District with respect to discipline." Id. at 1364. Regarding the quality of the District's facilities, the court determined that "[r]ace plays no factor in the receipt of use of [facilities] funding." Id. at 1365. As for extracurricular activities, the court found that "[a]ll District extracurricular activities are available to all of the

50

District's students without regard to race," and thus that any imbalances in participation were not "the result of presently practiced racial discrimination." Id.

Based on these findings, the district court concluded that the District had not violated the Plaintiffs' Fourteenth Amendment equal protection rights since it had not acted with any discriminatory purpose or intent. Id. at 1367.

We have explained previously that "[b]ecause the issue is a factual one, this Court can reverse a district court's finding of intentional discrimination only if the finding is clearly erroneous, is based on clearly erroneous subsidiary findings of fact, or is based on an erroneous view of the law." Barber v. Int'l Bhd. of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, 778 F.2d 750, 754 (11th Cir. 1985) (emphasis added); see also, e.g., Pullman-Standard v. Swint, 456 U.S. 273, 287-90, 102 S. Ct. 1781, 72 L. Ed. 2d 66 (1982) (holding that the issue of discriminatory intent in a race discrimination case is a factual question for the trier of fact, whose findings are reviewed only for clear error); Rogers v. Lodge, 458 U.S. 613, 622-23, 102 S. Ct. 3272, 73 L. Ed. 2d 1012 (1982). Here, the district court's thorough and reasoned analysis illustrates that it held no erroneous view of the law of intentional discrimination. Accordingly, the only possible ground for reversal is that the factual findings themselves are clearly erroneous, an issue we take up below.

51

5.

Finally, the Plaintiffs claim that a number of the district court's findings of fact were clearly erroneous. They argue that the evidence presented at trial demonstrates that the District has not taken all practicable steps to dismantle its prior de jure segregated school system, and that the District has intentionally discriminated against black students.

Federal Rule of Civil Procedure 52(a) dictates that we may review a district court's factual findings only for clear error:

> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon . . . . Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

Fed. R. Civ. P. 52(a). Clear error is a highly deferential standard of review. See, e.g., Manning, 244 F.3d at 940. As the Supreme Court has explained, a "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 746 (1948)).

"This standard plainly does not entitle a reviewing court to reverse the

52

finding of the trier of fact simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the trial court. 'In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo.' Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S. Ct. 1562, 1576, 23 L. Ed. 2d 129 (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. In short, where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 573-74.

The Plaintiffs first challenge the district court's finding that the District has taken all practicable steps to eliminate the vestiges of de jure segregation. They say that the district court's finding that demographics were the substantial cause of racial imbalances among the District's elementary schools was clearly erroneous for two principal reasons: first, because the evidence presented at trial did not show sufficiently significant demographic changes to account for the racial disparities in enrollment; and second, because the District could have counteracted these shifts

53

by implementing attendance zones. Here, the Plaintiffs have done nothing more than present an alternative (and permissible) view of the evidence, and therefore we cannot conclude that any of the district court's findings were clearly erroneous.

Our detailed review of the record leaves us with no doubt that the district court had a sound evidentiary basis for concluding that changes in Thomasville's demography and school enrollment substantially caused the racial imbalances among the student populations of the District's elementary schools. As we explained in more detail above, the district court based its findings on a thorough evaluation of Thomasville's school-enrollment data from 1965 (the last year the District was de jure segregated) to the time of trial. The district court observed that the District's first desegregation plan was ineffective, but that its second plan, adopted in 1970, in fact effectively desegregated the schools for at least six consecutive years and, indeed, received HEW approval.

Racial imbalances that developed subsequently, the district found, resulted not from the District's prior de jure segregation, but from a confluence of external factors, including a substantial decline in white enrollment in the District and population shifts within the District (in particular, a concentration of Thomasville's black population around Harper Elementary School, an area that was formerly predominantly white). As the racial imbalances at Harper grew, the district court

noted, HEW was alerted to the situation. After a series of exchanges with the District, HEW concluded that in spite of the imbalances, the District was "in compliance with Title VI of the Civil Rights Act of 1964 relative to assignment of students . . . to schools," and that "no further student desegregation is required of [the District] at this time."

Because these findings of the district court are soundly rooted in the record, we are left with no "definite and firm conviction" that they are erroneous. The Supreme Court has observed that "[a]s the de jure violation becomes more remote in time and these demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior de jure system." Freeman, 503 U.S. 496. In light of the entire record in this case, we find the district court's conclusion that changes in enrollment and demographics -- not prior de jure segregation -- account for the racial imbalances present more than three decades after Thomasville dismantled its de jure segregated school system to be more than plausible. Accordingly, this finding was not clearly erroneous.

Nevertheless, the Plaintiffs proceed to argue that the district court's conclusion that the District took all practicable steps to eliminate the vestiges of de jure segregation was clearly erroneous because the District refused to implement attendance zones to counteract the racial disparities that arose under its freedom-

of-choice system. The Plaintiffs' suggestion, however, clearly contradicts the Supreme Court's repeated admonition that courts may not intervene to maintain racial parity in schools once the initial constitutional violation has been remedied.

The district court, in this case, found that the District remedied the constitutional violation caused by it its de jure segregated school system through the adoption of its 1970 desegregation plan, which, undeniably, successfully desegregated the District's school for a number of years. Subsequent demographic and enrollment changes, however, intervened, undoing much of the racial balance achieved by the 1970 desegregation plan. While the District is, of course, free to adopt attendance zones or other constitutional measures that might counteract these effects, it is simply beyond the authority of any court to force such a policy measure on the District. As the Supreme Court has explained repeatedly:

> Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation. Once the racial imbalance due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors. . . .
> . . . .
> The effect of changing residential patterns on the racial composition of schools, though not always fortunate, is somewhat predictable. Studies show a high correlation between residential segregation and school segregation. . . .
>
> Where resegregation is a product not of state action but of private choices, it does not have constitutional implications. It is beyond the authority and beyond the practical ability of the federal

56

courts to try to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the courts of school districts simply because they were once de jure segregated. Residential housing choices, and their attendant effects on the racial composition of schools, present an ever-changing pattern, one difficult to address through judicial remedies.

Freeman, 503 U.S. at 494-95; see also Swann, 402 U.S. at 24 ("The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.").

Accordingly, the Supreme Court has concluded that a district court will exceed its authority when it intervenes to rearrange a school district's attendance zones in order to achieve greater racial balance. In Pasadena Board of Education v. Spangler, 427 U.S. 424, 96 S. Ct. 2697, 49 L. Ed. 2d 599 (1976), the Court held that a district court exceeded its remedial authority in requiring annual readjustment of school attendance zones when changes in racial composition of schools were caused by demographic shifts "not attributed to any segregative acts on the part of the [school district]." Id. at 436. The Court explained that "the District Court was not entitled to require the [school district] to rearrange its attendance zones each year so as to ensure that the racial mix desired by the court was maintained in perpetuity. For having once implemented a racially neutral

57

attendance pattern in order to remedy the perceived constitutional violations on the part of the defendants, the District Court had fully performed its function of providing the appropriate remedy for previous racially discriminatory attendance patterns." Id. at 436-37; see also Swann, 402 U.S. at 31-32 ("Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system.").

Because the district court would exceed its authority by requiring the City of Thomasville School District to adopt attendance zones in order to counteract racial imbalances caused by demographic forces rather than by prior de jure segregation, we cannot find the district court's conclusion that the District took all practicable steps to eliminate the vestiges of de jure segregation to be clearly erroneous on this basis.

The Plaintiffs also challenge the district court's finding that the District does not now intentionally discriminate against black students. First, the Plaintiffs point to several pieces of evidence presented at trial that the district court did not discuss in its opinion, arguing that the court's failure to acknowledge these pieces of evidence demonstrates that its factual findings regarding intent to discriminate are

58

clearly erroneous. Specifically, the Plaintiffs cite the fact that a District task force declined to replace the District's freedom-of-choice system of student assignment with attendance zones, at least in part because some members were concerned that such a change would prompt white students to leave the District and enroll in private schools, as well as the fact that one school administrator testified that she had reassigned white students based upon their parents "saying they didn't want their children in the mostly black classes."

While these two pieces of evidence are undoubtedly relevant, we cannot conclude that the district court's failure to mention them explicitly in its opinion somehow renders all of its detailed findings concerning intent to discriminate clearly erroneous. For one thing, the evidence presented by both parties at trial was extensive and the record in this case is voluminous. The district court was not obliged to recite and analyze individually each and every piece of evidence presented by the parties. The plaintiffs do not point to any specific factual finding that these particular pieces of evidence render clearly erroneous, but rather suggest that they invalidate the entirety of the district court's intentional discrimination analysis. This is simply not the case. As we have already described at some length, the district court carefully evaluated all pertinent areas of the District's operations, and concluded based on the entirety of the record that the District's

policies and programs are administered in a race-neutral manner, free of any intent to discriminate.

The law is well settled that "[i]f the district court's account of the evidence is plausible in light of <u>the record viewed in its entirety</u>, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." <u>Anderson</u>, 470 U.S. at 574 (emphasis added). We may reverse the district court only when "on the entire evidence" we are "left with the definite and firm conviction that a mistake has been committed." <u>Id.</u> at 573. After reviewing the lengthy record in its entirety, we are left with no such conviction. The pieces of evidence that the Plaintiffs highlight are no doubt significant, but "[w]e cannot overturn the district court's finding of fact simply because this evidence was merely conflicting." <u>Ga. NAACP</u>, 775 F.2d 1419. Simply put, ample evidence supports the district court's reasoned findings, and we therefore see no clear error.

Next, the Plaintiffs argue that statistical evidence establishes that the District intentionally discriminated against black students in the administration of discipline, rendering the district court's contrary conclusion clearly erroneous. The Plaintiffs claim that the district court ignored "uncontradicted statistical analysis demonstrating that blacks were administered harsher discipline than whites for the

same conduct." Appellants' Br. at 44.

However, in concluding that this was not the case, the district court relied on two witness' testimony to the contrary. The trial court explained that it found, "based upon the evidence presented at trial, no incident in which a black student received a harsher punishment than a white student for the same or similar misconduct," and "that the District does not treat black students differently from white students with respect to referrals for discipline." Thomas County NAACP, 299 F. Supp. 2d at 1364. Moreover, the district court observed, "[n]o evidence was presented at trial by Plaintiffs to refute Defendant's evidence that no black student has received a referral for punishment where a white student did not under the same or similar circumstances." Id. (emphasis added). Accordingly, the court concluded that "race has not been a factor in any decision made by the District with respect to discipline." Id.

The Plaintiffs do not point to any specific error in the district court's reasoning or otherwise explain how its account of the evidence is flawed. Again, as long as the district court's view of the evidence is "plausible," we have no ground for reversal. Anderson, 470 U.S. at 573. And our review of the record in this case again reveals that the district court's assessment is plausible; we, therefore, find no error in its conclusion that the District does not intentionally

61

discriminate against black students in the administration of discipline.

Finally, the Plaintiffs argue that statistical evidence demonstrates that the District intentionally discriminates against black students by using ability grouping to assign students to classes, rendering the district court's contrary conclusion clearly erroneous. We express no opinion as to which way the evidence points on this issue. Based on our earlier conclusion that the district court failed to apply the proper legal standard in assessing the constitutionality of the District's use of ability grouping, we remand for the district court to make new findings of fact on this issue.

We have explained numerous times that "only in circumstances when 'a district court applies an incorrect legal standard which taints or infects its findings of facts, [do] such findings lose the insulation of Rule 52(a) and judgment based thereon cannot stand.'" Jacksonville NAACP, 273 F.3d at 965 (quoting Manning, 244 F.3d at 940-41). On the issue of ability grouping, "the district judge's repeated use of the wrong legal standard sufficiently tainted or infected the findings of fact so as to strip those findings of the insulation normally accorded under Rule 52(a)." Manning, 244 F.3d at 943. We therefore remand for the district court to make new findings of fact, applying the correct legal standard.

62

III.

Finally, the District has cross-appealed the trial court's determination that each party should bear its own costs, asking us to reverse and remand for the district court to award costs or explain its decision not to do so.

Rule 54(d) of the Federal Rules of Civil Procedure provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d). In this case, the district court, on February 6, 2004, entered judgment in favor of the District, but "directed that each side shall bear its own costs." The court gave no explanation for denying costs to the District, as the prevailing party.

We have previously held that "where the trial court denies the prevailing party its costs, the court must give a reason for its denial of costs so that the appellate court may have some basis upon which to determine if the trial court acted within its discretionary power." Head v. Medford, 62 F.3d 351, 354 (11th Cir. 1995) (emphasis in original) (quoting Gilchrist v. Bolger, 733 F.2d 1551, 1557 (11th Cir. 1984) (citation omitted)). "Thus, although the district court has discretion to deny a prevailing party costs, such discretion is not unfettered." Id.; accord Fireman's Fund Ins. Co. v. Tropical Shipping & Const. Co.,254 F.3d 987, 1012 (11th Cir. 2001); Gilchrist, 733 F.2d at 1557. Rule 54(d) establishes "a

63

presumption that costs are to be awarded to a prevailing party," and that "[t]o defeat the presumption and deny full costs, a district court must have and state a sound basis for doing so." Chapman v. AI Transp., 229 F.3d 1012, 1038-39 (11th Cir. 2000).

The Plaintiffs suggest that the district court's "reasons for denying costs are implicit." Appellants' Br. at 29. They argue that the district court "implicitly acknowledged plaintiffs' good faith and socially important argument throughout the opinion." Id. However, the law of our Circuit establishes unambiguously that the district court must explicitly state its reasons for denying costs. Thus, although the district court may have acted well within its discretion in assigning each party its own costs, its failure to state a reason for doing so constitutes reversible error. We therefore vacate the district court's assignment of costs with the instruction that if the District prevails on the ability-grouping issue we have remanded for reconsideration, the district court must award costs to the District or explain its decision to deny them.

IV.

After careful review of the record and the district court's opinion in this case, we are convinced that the district court committed no error in declining to make a "unitary status" finding, in applying the so-called Keyes presumption, or in

64

applying the law of intentional discrimination. We, therefore, affirm the district court's findings of fact and conclusions of law on all of these issues. However, as to the district court's treatment of the Plaintiffs' challenge to the District's ability-grouping practices, we conclude that the court failed to apply the correct legal standard and that this error tainted its factual findings on this issue. We, therefore, reverse and remand for reconsideration of the Plaintiffs' ability-grouping claim. We can discern no clear error in the district court's remaining findings of fact, and therefore affirm in this respect, too. Finally, because the district court offered no explanation for declining to award costs to the District as the prevailing party, we vacate the assignment of costs and remand for reconsideration.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.